THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOSE VASQUEZ, Defendant-Appellant.

Second District   No. 2—98—0252

Opinion filed May 2, 2000.

Jeffrey Urdangen and Lawrence C. Marshall, both of Chicago, for appellant.

David R. Akemann, State's Attorney, of St. Charles (Martin P. Moltz and Joan M. Kripke, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE THOMAS delivered the opinion of the court:

Following a bench trial, the defendant, Jose Vasquez, was convicted of first-degree murder. The trial court sentenced him to 50 years in prison. The defendant appeals, raising the following contentions: (1)

that he is entitled to a new trial because the State failed to disclose certain evidence in discovery and knowingly presented false testimony during trial; (2) that he is entitled to a new trial on the basis of newly discovered evidence; and (3) that the State failed to prove him guilty beyond a reasonable doubt.

The record reveals that on January 27, 1997, the trial court ordered the State to disclose "any deals or leniency or consideration that is given to Larry Wilkinson or [any] other witness" in the case. In its oral pronouncement on the matter, the trial court ruled that the State should disclose any evidence of "bias, motive, promises, leniency, payments, [or] consideration" that might bear on the credibility of Wilkinson as a witness.

Despite the fact that a mistrial was declared at the first trial in this case, the cause eventually proceeded to a second trial, which commenced on June 9, 1997. At the second trial, the State and the defendant stipulated to the testimony of various witnesses, and the stipulation was then read into the record. That evidence would show that Corey Lesure was a 15-year-old African-American who was shot and killed at 9:57 p.m. on May 15, 1994. His mother would testify that late on the evening of May 15, 1994, the victim left their home to go to the area of West Park Place and East New York Street in Aurora, Illinois, to get money owed to him as a result of a painting job he had done for a woman earlier in the week. He rode his bike to the location and had not been gone long when he was found, around 10 p.m., lying facedown at the southeast corner of 32 West Park Place by Aurora police officer Donka.

Dr. Shaku Teas, a forensic pathologist, would testify that she conducted an autopsy on the remains of the victim. She determined that Corey Lesure died of a gunshot wound to the back. She explained that the bullet entered the right side of the victim's back, traveled across his body, and exited the left shoulder area. The direction of the wound tracked from the back to the front, right to left, and upwards.

Andre Roberts would testify that around 9:50 p.m. on May 15, 1994, he was standing in the center of McCarty Park, which is bordered by West Park Place and East New York Street. At that time, Roberts heard approximately 10 to 12 gunshots that came from the area of East New York Street and Fourth Street. He then observed two Mexican males dressed in black running northbound on Fourth Street after the shots were fired.

Joyckley Stewart would testify that around 9:50 p.m. on the date in question she was in the living room of her residence, located at 32 West Park Place, when she heard 10 to 15 gunshots fired. She then observed two Mexican males run northbound on Fourth Street from East New York Street.

Darryl Bailey would testify that he witnessed the shooting of Corey Lesure. At the time of the shooting, he was seated in the driver's seat of a vehicle parked across the street from 32 West Park Place. He heard about seven or eight gunshots and observed a Mexican male firing a handgun from the west side of a residence located at the northwest corner of Fourth and East New York Streets. The gunman was about 5 feet 7 inches and 170 pounds with short dark hair in a pony tail. He was wearing a black hooded sweatshirt and long red shorts. He then observed the suspect flee north through the yard of the residence located at the northwest corner of Fourth and East New York Streets, and then eastbound toward Fourth Street. Bailey did not see the shooter's face and could not identify him.

Aurora police officer M. Dabney would testify that after the shooting he found nine spent shell casings at 330 East New York Street about six feet from the west side of the building and approximately one third of the way from the front of the building to the rear of the building. The area where Corey was shot at 32 West Park Place could be viewed from the area where the casings were recovered. The streetlight at the intersection of West Park Place and East New York Street was functioning and the area was illuminated when Dabney arrived at the scene at 10:20 p.m. on the night of the shooting.

Aurora police officer Rodriguez would testify that on May 15, 1994, at 10:22 p.m. he was flagged down by an Hispanic male. The man told the officer that he was walking home after visiting his girlfriend and observed a black-haired Mexican male, about 5 feet 6 inches, 170 pounds, wearing red shorts and a dark colored shirt that was possibly a sweatshirt. The Mexican male ran past him northbound on Fourth Street just north of Flagg Street. He then got into a light gray, four-door Buick with a gray vinyl top. That car was carrying three other Mexican males. Officer Rodriguez would further testify that that same evening he had observed the same gray Buick on Claim Street turning northbound on High Street at about 10:05 p.m. At that time, the car was occupied by four Mexican males.

Aurora police sergeant Paul Nelson testified at the defendant's trial that on February 29, 1996, the defendant told him that he had information on three homicide cases that he wanted to share with the police department. The defendant had been an informant for Officer Donka of the Aurora police department. The defendant told Sergeant Nelson that he had information on a case involving a man who was killed across from McCarty Park behind Donino's in Aurora. The defendant drew a map of the area, which was introduced into evidence. As he drew the map, the defendant gave his version of the Corey Lesure murder. However, at the time, Sergeant Nelson did not know

what murder the information was related to, and he did not begin to make that determination until after the defendant left.

According to Nelson, the defendant told Nelson that the defendant's cousin, Eddy Guerrera, had killed the victim. The defendant initially told Nelson that he was standing with Guerrera when it happened. He showed Nelson on the map that he and Guerrera were standing on the northwest corner of New York Street and Fourth Street. He also had the defendant highlight with a pink highlighter the area where the defendant and Guerrera were standing. The defendant further indicated that the shots were fired to the southwest corner of New York Street and West Park Place. The defendant marked with a little star the area on the map where the victim was hit. Nelson later had the defendant highlight that star with yellow to indicate where the victim was located. The defendant signed and dated the map.

Nelson further testified that the defendant told him that immediately prior to the shooting he and Guerrera had been visiting friends at the house of Frank Ramirez, which was on the west side of Fourth Street and the third house from New York Street. They were all Latin King gang members. After they got in a car and went to Donino's to get a pop, they were about to turn north onto Fourth Street from New York Street when they noticed a group of Gangster Disciples hanging out on the corner of New York Street and West Park Place. They proceeded to pull into Ramirez's driveway. Guerrera then asked Ramirez if he had "a missile," which was their term for a firearm. The defendant and Guerrera then walked south down Fourth Street to New York Street. They were the only two to do so. They eventually went to the west side of the house on the northwest corner of Fourth Street. From there, they could see the Gangster Disciples hanging out on the corner across the street. The defendant and Guerrera then began "throwing gang signs down" at the Gangster Disciples. At that point, Guerrera pulled out a pistol and began firing at the Gangster Disciples. According to Nelson, the defendant told him that the Gangster Disciples were a rival gang that was "hooding," which meant hanging out in the area. The defendant further told Nelson that, after Guerrera fired the shots, the Gangster Disciples began shooting back at them. The defendant and Guerrera then ran east down the driveway of the house on the northwest corner of New York to Fourth Street and then north on Fourth Street to Ramirez's house.

Nelson further testified that, after he heard this oral statement from the defendant, Nelson wanted to get a typed statement from the defendant. As they started the typed statement, the defendant asked Nelson whether he could get in trouble for this. Nelson responded

that there was a possibility that he could and that he would have to advise the State's Attorney's office about the information. It would be the State's Attorney's decision as to whether the defendant would be charged with any offense. Nelson informed the defendant that he would not be charging him with anything that night and that after the interview he would give him a ride home.

The defendant then proceeded to give Nelson a typed statement. That statement was introduced into evidence at the trial. It differed significantly from the defendant's oral statement. In the written statement, the defendant stated that he thought Guerrera was only going to throw gang signs and did not know that Guerrera was going to shoot because "he was the type of person that would shoot at night." The defendant stated that he and Guerrera went walking down the driveway on the north side of the house at the northwest corner of New York and Fourth Streets. According to the defendant, Guerrera walked ahead of him and the defendant remained by the stairs in front of that house. Guerrera walked to the end of the house and was no longer in the defendant's sight. The defendant then heard two shots fired and ran back to Ramirez's house. The defendant then heard more shots. When the defendant reached Ramirez's house, he told Ramirez that the Gangster Disciples were shooting at them, and Ramirez responded, "no[, Guerrera's] shooting at the Gangster Disciples." The defendant then asked Ramirez why he did not tell him that, and Ramirez responded, "my fault." At that point, Guerrera returned to Ramirez's house and the defendant saw the gun barrel sticking out of Guerrera's sweatshirt. Guerrera and Ramirez went inside the house, but the defendant left and went to Jimmy Torres's house and told him what had happened.

Sergeant Nelson further testified that he interviewed Larry Wilkinson on August 1, 1996, and that he gave him a statement about the identity of the person who fired the shots in this case. Wilkinson identified the defendant as the shooter from a photographic lineup. According to Nelson, when Wilkinson pointed at the defendant's photograph, he said "that looks just like the guy," but he could not be absolutely positive because it happened so long ago. When Nelson asked Wilkinson to gauge his certainty on a scale of 1 to 10, Wilkinson responded that he would put his level of certainty at about 4 or 5 but that he "looked just like the guy."

On cross-examination, Sergeant Nelson stated that when the defendant left the police station on February 29, 1996, he was not a suspect. When Wilkinson came to the police station on August 1, 1996, Nelson was not aware that Wilkinson had a pending burglary case in Kane County. Because Wilkinson had come from Iowa to give his statement, Nelson gave him $30 for gas.

On redirect examination, Nelson testified that during his statement on August 1, 1996, Wilkinson told Nelson that he saw two suspects squatting down on the west side of the house when the shots were fired. He said that he only saw one of them shooting, and he described that person as a short, chubby Hispanic male with some facial hair. Nelson asked Wilkinson to identify in the photo lineup the short, chubby person he had seen firing the weapon.

Aurora police officer Marshal Eugene Gauer testified that he interviewed Larry Wilkinson on June 9, 1994. Wilkinson was a confidential informant. Gauer noted that he incorrectly placed the statement that he took from Wilkinson on June 9, 1994, in the file on the Corey Lesure murder case but that the statement actually related to a homicide that occurred on May 11, 1994, case file No. 94—8901. Gauer further noted that he later determined that the statement did not relate to the May 11 case (No. 94—8901) either, because the information in that file as to the location of the shooter was different from the information in the statement given by Wilkinson and an arrest had been made in that May 11 case. Gauer testified that he brought Wilkinson in to view a live lineup on September 3, 1996. After Wilkinson went through the lineup once, Gauer asked Wilkinson if he wanted to see anyone a second time. Wilkinson asked to see the defendant, who was number five in the lineup, a second time and requested that the defendant be asked to tilt his head back with his chin upward. After the lineup was over, Wilkinson stated that he did not "see him in there" but that he was 90% sure number five was the man he had seen shooting on May 15, 1994, and that he was "a little thinner" now. After the lineup, Gauer and Wilkinson stopped to eat and Wilkinson told Gauer at that time that he was 90% sure that number five was the shooter, but he did not want to identify him unless he was 100% sure. After they finished eating, Gauer bought Wilkinson a hotel room for the night because he had traveled from Iowa. The next day, Gauer bought Wilkinson a bus ticket back to Iowa.

Officer Gauer further testified that he did not consider Wilkinson to be a paid informant and that he had not given Wilkinson any money to come forward with any of the information that Wilkinson provided in connection with the case. Gauer did acknowledge that, in addition to a hotel room, a bus ticket, and a meal after the lineup, the police department paid for Wilkinson's moving expenses to Iowa. Gauer stated that he did not know if Wilkinson had any pending charges at the time he came forward with the information on August 1, 1996, about the Corey Lesure murder.

On cross-examination, Officer Gauer testified that he had known Wilkinson for more than 10 years in a "police capacity" but that he

had been an informant only since 1991. He acknowledged that Wilkinson had provided information in 1992 about another murder that occurred in McCarty Park in 1991 and that in exchange for his testimony in that case two felony charges pending against Wilkinson were reduced to misdemeanors. Gauer admitted that when he filed the information given by Wilkinson on June 9, 1994, he did not know if it could have been related to another case. Gauer stated that he visited Wilkinson twice while Wilkinson was in jail in Iowa. Gauer could not recall if he knew whether or not at the time of the lineup in September 1996 Wilkinson had a felony charge for burglary pending in Kane County. Gauer denied that he had made an attempt to talk to the State's Attorney's office about favorable treatment for Wilkinson in connection with the burglary charge. However, he did admit that he told an assistant State's Attorney that he did not think that Wilkinson should take the brunt of the case because Wilkinson's brother did the actual burglary.

On redirect examination, Officer Gauer testified that he thought that he had known Wilkinson for 11 or 12 years but that it was not on a personal basis but rather "its on knowin' of him." Gauer further testified that, in all, either Gauer or the Aurora police department gave Wilkinson $273 for a hotel and moving expenses in 1995, $95 for a U-Haul rental, $80 for a U-Haul, $15 for a receipt, $110 when he went back to Iowa, and a $50 personal loan.

Larry Wilkinson testified that he was currently serving a 10-year prison sentence in Iowa for burglary. He noted that he had a burglary charge pending in Kane County and that he did not have any deal in exchange for his testimony in this case but that his attorney had told him that the charge was going to be reduced to a misdemeanor. Wilkinson stated that, when he went to the police station on August 1, 1996, to report the May 15, 1994, shooting, he wanted to talk to Officer Gauer, but Gauer was not there, so he gave a statement to Sergeant Nelson. Wilkinson noted that he wanted to talk to Gauer because "[Wilkinson] knew 'em a little bit and [Gauer] had arrested [Wilkinson] before so [Wilkinson] remembered him ***."

Wilkinson explained that he did not come forth sooner with information about the murder because he was afraid but that after he moved to Iowa he felt safer. Wilkinson stated that he moved to Davenport, Iowa, on July 30, 1995. He had some financial difficulties and Officer Gauer gave him a personal loan of $50 at that time. He further noted that when he came to Kane County from Iowa for the lineup, he was provided a hotel for the night, a $54 bus ticket and $10 to eat. While he was incarcerated in Iowa, he spoke with Officer Gauer on the phone no more than three times and Gauer came to visit him once.

Wilkinson further testified that on the evening of May 15, 1994, he was walking home from a liquor store where he had bought a pack of cigarettes and a pop. He slowed down at New York Street, near Mc-Carty Park, because he saw two men squatting down behind a house at the northwest corner of Fourth and New York Streets. He saw one of the two men shoot at some people who were standing across the street at the corner of New York Street and West Park Place. Although it was dark outside, Wilkinson was able to see the two men because there was a bright light on the side of the house. One of the men was tall and skinny and the other was short and chubby. Wilkinson testified that he did not remember what the two men were wearing that night other than that they were both wearing black hooded sweat-shirts. Wilkinson saw muzzle flashes coming from the hand of the short, chubby man and heard gunshots. The short, chubby man was squatting down in front of the other man when the shots were fired. After the shots were fired, Wilkinson hurried across the street and the two men came from behind the house and approached him. At that point, Wilkinson was scared and did not know what was going to happen. However, he recognized the tall, skinny man as Juan Rena, who had been one of his best friends growing up. Rena was holding a .38-caliber handgun. At the time of the incident, Wilkinson did not know the identity of the short, chubby man, but he did see the man's face. Wilkinson identified the defendant at trial as the short, chubby man he had seen that night. As the two men ran by, Rena said something to Wilkinson, but Wilkinson did not say anything to Rena or the defendant. Rena and the defendant continued to run, and Wilkinson continued walking. On a map, Wilkinson highlighted the path of flight that the two men took following the shooting.

On cross-examination, Wilkinson testified that he was sentenced to two years in prison in 1991 for an escape conviction and three years in prison in 1993 for a burglary conviction. Wilkinson acknowledged that he was also convicted of theft in 1991 and child abduction in 1993. Both of these charges were reduced to misdemeanors in exchange for information that he gave about another murder that had occurred in McCarty Park in 1992.

Wilkinson further testified on cross-examination that he was given instructions at the live lineup to write down the number of the person in the lineup that had done the shooting. He acknowledged that he had the defendant step forward and tilt his head back during the lineup but that he did not write his number on the paper provided. He noted that, later that day, he told Officer Gauer that the defendant was the man he had seen that night but that he looked a little different without facial hair.

Wilkinson further stated that, on the day after the May 15, 1994, offense, he went to the home of his good friend, Jaime Peterson, at 126 North Fourth Street in Aurora. According to Wilkinson, Peterson was a Latin King gang member. The short, chubby suspect was there too. While the three of them smoked marijuana in the backyard, the short, chubby suspect asked Peterson if he had disposed of the gun for him. Peterson told the suspect that he did and that it was at a cement factory on Lincoln Avenue. Donny Rodriguez also lived at 126 North Fourth Street, but he was not present during the conversation. Wilkinson acknowledged that, when he told Officer Nelson about the conversation with the defendant, Wilkinson had refused to tell him Peterson's name. However, in August 1996, Gauer advised Wilkinson that he would have to divulge Peterson's name.

Wilkinson explained that the information he gave to Gauer on June 9, 1994, about Rudy Vallez being the shooter related to another incident that occurred at the same location. Wilkinson stated that his sister, Malicia Loeb, gave a statement to the police on May 15, 1994, that Rena was involved in the shooting of Corey Lesure. However, the parties stipulated at trial that there was no indication from the police reports that Loeb had given a statement to the police about the May 15, 1994, shooting. Instead, police reports showed that Loeb gave a statement to police on May 11, 1994, about the shooting that occurred on that date.

Robert Lucas, an investigator for the public defender's office, testified that he attended the live lineup on September 3, 1996. Lucas noted that, when Wilkinson viewed the first four participants in the lineup, Wilkinson had no response. However, when the defendant, who was the fifth participant, stepped forward, Wilkinson leaned forward and paid much closer attention. Wilkinson then asked that number five step forward again and that he be requested to tilt his head. After the lineup, Lucas was outside with Wilkinson, and Wilkinson told him that he really did not "think he was in there."

Based on the foregoing evidence, the trial court found the defendant guilty of first-degree murder. During the course of the posttrial proceedings, the defendant filed a motion for a new trial based on newly discovered evidence. The defendant's motion stated that he had uncovered evidence after trial showing that Officer Gauer had given Wilkinson more extensive assistance than either of them had testified to at trial, that Wilkinson had admitted to several friends that he had given false statements and testimony to obtain a deal for himself in his various felony cases, that Wilkinson and Officer Gauer had a much closer relationship than either of them had testified to at trial, and that Peterson had been contacted after trial and told the defense that

the alleged conversation on the day after the shooting between him and the defendant never took place.

At the hearing on the defendant's motion for a new trial, Robert Lucas testified that it was only after Wilkinson testified at trial on June 10, 1997, that the defense had any indication of a last known address for Peterson. Thereafter, Lucas sought to locate Peterson but ran into difficulty when he learned that Peterson had moved from Aurora to Ottawa, Illinois. Through his contact with Mario Britton, Lucas was eventually able to locate Peterson in August 1987. During their conversation, Britton also told Lucas that Patty Sanchez, the defendant's girlfriend, had some information that would be very interesting to Lucas. After meeting with Sanchez, Lucas also learned that Sarah George and Jennifer Sanchez had information relevant to the case. Lucas further testified that subpoenaed records from various Iowa correctional facilities revealed that Gauer had placed $50 in Wilkinson's commissary fund on March 17, 1997, which was three months prior to the trial in the present case.

At the hearing on the motion for a new trial, the defense introduced into evidence a transcript of a taped telephone conversation from the Iowa Department of Corrections in which Officer Gauer discussed with Wilkinson how Gauer could send money to Wilkinson in prison without its being discovered. Wilkinson suggested that Gauer have Wilkinson's public defender send it. Gauer responded that he did not want to involve the public defender in the matter because she would "get her fuckin' ass canned." Gauer then told Wilkinson that he would have a girl who worked at a shoe store send it as a refund. The defense also introduced into evidence subpoenaed phone records from the Iowa jails that revealed that 34 calls were placed from Wilkinson's cell block to Officer Gauer, which led to a total of five hours of conversation. Other records from the Iowa Department of Corrections revealed that Wilkinson placed 100 calls to Gauer while in prison, 32 of which led to conversations totaling more than three hours.

Jaime Peterson testified that he moved to Ottawa in March 1997. Before that time, he lived on North Fourth Street in Aurora. Peterson stated that he had never had a conversation with the defendant and that they were not friends. Peterson noted that he had known Wilkinson for seven or eight years. Peterson stated that he was never at the home of his uncle, Donny Rodriguez, with Wilkinson and the defendant at the same time and that he did not think that the defendant had ever been to that house. Peterson claimed that he was a Latin King gang member and would not have associated with the defendant because he was a member of a rival gang. When he was asked what gang the defendant was in, Peterson responded, "I don't know. I heard

he was in opposition. I couldn't tell you, Disciples. Who knows." Peterson further stated that he had never smoked marijuana with the defendant but that he had smoked it with Wilkinson.

On cross-examination, Peterson testified that the Latin Kings were friends to the Vice Lords. Peterson noted that he was a member of the Latin Kings on May 15, 1994, and had been for at least two years prior to that date. He further noted that Juan Rena had been a good friend of his but had been murdered.

Sara George testified that she currently lived in Davenport, Iowa, with her boyfriend, Mario Britton, and with Patsy Sanchez. The first time George had a conversation with Wilkinson was in April 1995. Wilkinson told George that he had just come back from West Virginia. He told her that "the Sheik" had rented him a car and given him some spending money to go out there because there had been a warrant out for Wilkinson's arrest. He came back when "the Sheik" told him it was safe to do so. When she asked him who "the Sheik" was, he told her it was a detective who was his "connection." She recalled another incident in August 1996, when Wilkinson threatened her by stating that he would kill her and "walk away from it scot-free because he's got the man, he's got the Sheik." On cross-examination, George stated that she later learned that "the Sheik" was Officer Gauer. She further stated that Britton had been a member of the Vice Lords gang. She claimed that, in May or June 1996, Wilkinson told her that the Sheik told him what to say about a murder. According to George, Wilkinson told her that he had "messed up" at first but then the second time he "did it right" and that he was glad it did not go to trial because "he didn't know what the hell he was talking about." She also testified that she had heard "talk" to the effect that Wilkinson lied about the Lesure murder and that "the Sheik" told him what to say.

Jennifer Sanchez testified that Patsy Sanchez is her sister. She stated that Wilkinson was Patsy's boyfriend. Jennifer had known Wilkinson for at least four years but did not like him because he had hit Patsy. She further stated that, in June or early in July 1997, Officer Gauer had called her to pass on a message to Patsy from Wilkinson.

Patsy Sanchez testified that Wilkinson had been her boyfriend for about five years and that they had had four children together. When Wilkinson got out of jail in 1992, he told her that Gauer got him out of jail after he lied to Gauer about a murder case that occurred in McCarty Park in 1991 or 1992. According to Patsy, Wilkinson also told her that he hoped the defendant in that case would plead guilty because he did not know anything about what had happened in that

case. She stated that, when Wilkinson later learned that the defendant in that case had pled guilty, he told her that he was glad because he had not witnessed the murder. She stated that she knew Officer Gauer and that he was also known as "the Sheik." With respect to the present case, Patsy testified that Wilkinson told her in August 1996 that he hoped the defendant in this case would plead guilty because he did not see what had happened and had lied. According to Patsy, Wilkinson got his information about the shooting in this case from his sister and from Juan Rena, who told Wilkinson that Rena and another person "had blasted somebody at the park."

Patsy Sanchez further testified that Wilkinson was arrested in July 1996 for his Kane County burglary charge and that she got him released by posting a $500 bond. She later got the bond money back and then spent it. After he was released, Wilkinson moved to Iowa in August 1996 and by September 1996 he was incarcerated in jail there. She stated that, when Wilkinson turned himself in to the Iowa authorities, Officer Gauer had accompanied him and tried to obtain his release on bond. While Wilkinson was in jail in Iowa, he frequently told her that Gauer was trying to get him out of jail. He also told her that Gauer was trying to get the Kane County burglary charge dropped so that Wilkinson's word would be "good in court for this murder trial." Patsy further testified that, after Wilkinson was incarcerated in Iowa, Officer Gauer called her once or twice a month to pass on messages from Wilkinson. Gauer also told her on one occasion that she was supposed to use the $500 in bond money that had been returned to her to get Wilkinson out of jail in Iowa. She further testified that she needed $700 to post bond for Wilkinson in Iowa and, because she did not have the additional amount needed, she spent the $500. When Gauer found out that she had spent the money, he was mad. Patsy further testified that in December 1996 a restraining order was entered prohibiting Wilkinson from having any contact with her. However, Gauer attempted to contact her on behalf of Wilkinson and arrange three-way phone calls. Patsy stated that over a period of several years Gauer gave the defendant between $20 and $40 about every two or three months.

On cross-examination, Patsy stated that she was angry with Larry Wilkinson because it was his fault that her children had been taken away from her on August 27, 1996. She stated that Wilkinson told her that he had lied about three murders in McCarty Park. However, she admitted that he did not specify that he had lied about the Corey Lesure murder in particular. She noted that she had seen Gauer actually give Wilkinson money on only two occasions, once in 1992 or 1993 and once in 1995 when Gauer rented a car for Wilkinson and handed

him money to go to West Virginia when there was a warrant out for his arrest.

Davenport, Iowa, police officer Andre Neyrinck testified that in September 1996 he was investigating a burglary in which Wilkinson walked up to a parked car and reached through an open window to grab a purse from the seat. A warrant was issued for Wilkinson's arrest in connection with that crime on September 16, 1999. Thereafter, Gauer called Neyrinck on the phone and told him that Wilkinson was a witness in a homicide case that was getting ready to go to trial and he wanted to keep Wilkinson out of jail to protect his credibility. Gauer further told Neyrinck that he had a job lined up for Wilkinson in Ottawa. Gauer made it clear that if charges were filed against Wilkinson, Gauer preferred that a certain type of citation called a "non-traffic citation" be issued so that Wilkinson's arrest could be noncustodial. On September 26, 1996, Gauer brought Wilkinson to the Davenport police station and Gauer sought a pretrial release of Wilkinson. Despite the efforts by Gauer, Wilkinson was not released.

Officer Neyrinck further testified that while Wilkinson was in jail he often called Neyrinck seeking to trade information in exchange for leniency in connection with his charge. Neyrinck noted that Wilkinson did not give him enough information about the crime to follow up, and it appeared that the alleged crime occurred outside his jurisdiction.

Officer Gauer testified at the hearing on the motion for a new trial that he sometimes used the nickname "Sheik" because it was easier for people to remember in connection with his police work among the gangs. Gauer testified that Wilkinson was not an informant that was paid for information. Gauer explained that Wilkinson was given money when he needed help. Gauer noted that he felt that Wilkinson was "rehabilitatable" and that Wilkinson looked to Gauer as an "uncle" and "a father figure that he never had when he was growing up." Gauer recalled that once he gave Wilkinson money to rent a car to go east when there was a threat on his life. Another time he gave him $80 to move from his apartment in Iowa, and it cost an additional $15 to wire him that money. Gauer also brought lunch to Wilkinson one time when he visited him in jail. Additionally, Gauer noted that Officer Nelson gave Wilkinson $30 for gas money. Gauer further noted that on three different occasions he gave Wilkinson personal loans of $50 each and that he has reminded Wilkinson that when he gets out of prison he owes Gauer $150. Gauer explained that he had testified at trial about two of the $50 loans but that he had forgotten about the third one at trial so did not mention it. On cross-examination, he noted that he had testified at trial that he did not recall whether there was any other money given and that possibly he was still confused

about where he gave Wilkinson that additional $50 because he did not write it down.

Gauer explained that he had testified at trial that he had had only two or three conversations with Wilkinson because he thought that he was being asked about conversations pertaining to the Corey Lesure murder and not to conversations about other matters. He stated that if he had been asked about how many times he had any contact with Wilkinson in Iowa, he would have testified that it was 30 or 40 times because Wilkinson was driving him "nuts calling *** collect all the time."

Gauer testified about the taped conversation between him and Wilkinson. Gauer noted that Wilkinson wanted $100 for a Walkman and gym shoes. He stated that the money had nothing to do with his testimony because otherwise it would have come from the police department. Gauer noted that he felt sorry for Wilkinson. Gauer tried to hide the money because he did not want to be "put down for [his] kindness" and Gauer felt that he "was on trial in a way because of [his] kindness."

Gauer acknowledged that he made a couple of attempts in the State of Iowa to secure Wilkinson's release either by not having him charged or getting him out on bond. He also admitted that these attempts were made during the time that Wilkinson was a witness in the present case. Gauer noted that Mario Britton was in jail in Iowa for theft because Wilkinson had turned him in. Gauer explained that he had advised Officer Neyrinck that he would like Wilkinson to be released on a personal recognizance bond because Wilkinson was a witness in a gang homicide and he had a job lined up for him in Illinois and would keep him out of trouble.

On appeal, the defendant first argues that he is entitled to a new trial because the State violated his discovery rights by failing to disclose the cash payments made by Gauer to Wilkinson while Wilkinson was incarcerated in Iowa jails and by failing to disclose any of the efforts to secure leniency on behalf of Wilkinson in connection with his pending charges. See *Brady v. Maryland*, 373 U.S. 83, 87, 10 L. Ed. 2d 215, 218, 83 S. Ct. 1194, 1196-97 (1963) (where Court held that state is required to disclose evidence that is favorable to the accused and material to either guilt or punishment); see also *Giglio v. United States*, 405 U.S. 150, 154, 31 L. Ed. 2d 104, 108-09, 92 S. Ct. 763, 766 (1972) (where Court applied the *Brady* rule to nondisclosure of evidence affecting the credibility of a witness that might be determinative of the accused's guilt or innocence). The defendant further argues that the State's failure to disclose all of Gauer's efforts on behalf of Wilkinson vitiated the defendant's jury waiver and thereby entitled

him to a new trial. The defendant also contends that he is entitled to a new trial because the State, or its agents, knowingly used false or perjured testimony when Gauer testified at trial about the extent of the cash payments made to Wilkinson and the type of relationship that existed between the two men.

In response, the State contends that any undisclosed or false evidence did not affect the outcome of the case, and, therefore, a new trial is not warranted. The State maintains that Gauer's undisclosed cash payments, along with the efforts on behalf of Wilkinson in connection with the Iowa charge, did not occur until after Wilkinson made his August 1, 1996, statement implicating the defendant. Furthermore, the taped conversation between Wilkinson and Gauer occurred after the trial and did not relate to payment in exchange for testimony, and no money was ever sent pursuant to that conversation. Therefore, the State contends that all of the complained-of matters, i.e., the cash payments, the efforts made by Gauer in connection with Wilkinson's charges, and the information in the taped phone conversation, did not bear on Wilkinson's credibility. The State also maintains that Wilkinson was entitled to exoneration of his Kane County bond, so any effort by Gauer in that regard was not subject to any discovery order in the case and that, even if it was, there was no nexus between it and Wilkinson's August 1, 1996, statement, which occurred before Gauer's efforts.

■ The United States Supreme Court set forth the government's affirmative duty to disclose evidence favorable to the defendant in *Brady*, 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194. *People v. Hobley*, 182 Ill. 2d 404, 432 (1998). There, the Court established the general rule that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87, 10 L. Ed. 2d at 218, 83 S. Ct. at 1196-97. The prosecution cannot escape its duty under *Brady* by contending that the suppressed evidence was known only to a police investigator and not to the prosecutor at trial. *Kyles v. Whitley*, 514 U.S. 419, 438, 131 L. Ed. 2d 490, 508-09, 115 S. Ct. 1555, 1568 (1995). The Court in *Brady* explained that this principle is not intended to punish society for the misdeeds of the prosecutor but to ensure a fair trial for the accused and to protect the administration of justice. *Brady*, 373 U.S. at 87-88, 10 L. Ed. 2d at 218-19, 83 S. Ct. at 1197.

■ When the reliability of a given witness may well be determinative of guilt or innocence, the nondisclosure of evidence affecting credibility falls within the general *Brady* rule. *Giglio v. United States*, 504

U.S. 150, 154, 31 L. Ed. 2d 104, 108, 92 S. Ct. 763, 766 (1972). To establish a violation of the rule, suppressed evidence must be both favorable to the accused and material. *Hobley*, 182 Ill. 2d at 432. The evidence is "material" only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. *United States v. Bagley*, 473 U.S. 667, 682, 87 L. Ed. 2d 481, 494, 105 S. Ct. 3375, 3383 (1985). The question is not whether the defendant more likely than not would have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. *Strickler v. Greene*, 527 U.S. 263, 289-90, 144 L. Ed. 2d 286, 307, 119 S. Ct. 1936, 1952 (1999). The materiality aspect requires a "showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435, 131 L. Ed. 2d at 506, 115 S. Ct. at 1566. In making its materiality determination, a court should consider the cumulative effect of all suppressed evidence favorable to the defense, rather than consider each piece individually. *Hobley*, 182 Ill. 2d at 433.

■ With respect to perjured testimony, it is well settled that the State's knowing use of such testimony to obtain a criminal conviction constitutes a violation of due process of law. *People v. Olinger*, 176 Ill. 2d 326, 345 (1997). This is true even when the false testimony goes only to the credibility of a witness. *People v. Steidl*, 177 Ill. 2d 239, 261 (1997); *People v. Torres*, 305 Ill. App. 3d 679, 685 (1999). This is because the " 'jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend.' " *Olinger*, 176 Ill. 2d at 345, quoting *Napue v. Illinois*, 360 U.S. 264, 269, 3 L. Ed. 2d 1217, 1221, 79 S. Ct. 1173, 1177 (1959). A conviction obtained by the knowing use of perjured testimony must be set aside if there is "any reasonable likelihood that the false testimony could have affected the jury's verdict." *Olinger*, 176 Ill. 2d at 345. The trial prosecutor need not have known that the testimony was false; it is enough if there was knowledge by representatives or agents of the prosecution. *Torres*, 305 Ill. App. 3d at 685.

■ Applying the above-mentioned principles, we conclude that the defendant is entitled to a new trial on his *Brady* claim and on his knowing-use-of-false-testimony claim. At the outset, we note that, although the defendant's own statements to police placed him at the scene of the crime, the State's case in proving that the defendant was the shooter responsible for Lesure's murder rested almost, if not

entirely, on the testimony of Wilkinson. This is so because the first-degree murder charge brought against the defendant alleged that he was the shooter responsible for Lesure's murder and did not allege an accountability theory. Although we find that the testimony in the record was sufficient to find the defendant guilty beyond a reasonable doubt, we nevertheless find that this was a close case given the discrepancies between Wilkinson's testimony and other eyewitness accounts along with Wilkinson's lackluster pretrial identifications. Here, the trial court's discovery order required the State to disclose any evidence of "bias, motive, promises, leniency, payments, [or] consideration" that might affect Wilkinson's credibility as a witness. Here, Officer Gauer testified at trial that, in addition to all the payments made to Wilkinson by the department, he had personally lent Wilkinson $50. However, at the posttrial hearing Gauer testified that he made three $50 loans and claimed that he had testified about two of them at trial but had forgotten about the third. However, Gauer's trial testimony clearly shows that he testified only about one $50 payment. In addition to the State's failure to disclose these two payments, the State also did not disclose Gauer's attempts to keep Wilkinson out of jail in Iowa.

While this favorable evidence taken alone might not indicate that the outcome of the trial was affected, we believe that this evidence, in conjunction with Wilkinson's and Officer Gauer's false and misleading testimony about the extent of their relationship, served to put the whole case in such a different light as to undermine confidence in the verdict. Wilkinson testified that he had only three phone conversations with Officer Gauer while he was incarcerated in Iowa. Yet subpoenaed phone records indicated that the two men actually had more than 60 phone conversations during that time. Moreover, Gauer testified at trial that he knew Wilkinson in "a police capacity" and on a "knowin' of him" basis. Yet at the posttrial hearing, he testified that Wilkinson looked to him as an "uncle" and a "father figure." It was also revealed that Gauer was promising to line up a job for Wilkinson. We believe that the cumulative effect of this testimony was to throw the case in such a different light that the outcome was in question. The State is mistaken in its claim that none of Officer Gauer's undisclosed efforts could have tainted Wilkinson's credibility because the witness's statement to police was given before any consideration was given by Gauer. That argument, however, ignores the relevant facts of the case. In that regard, we note that Wilkinson had a pending burglary charge at the time he made the statement and initially requested to talk with Gauer, with whom he had a history of trading information for leniency. This suggests the possibility that Wilkinson already had

an idea of trading information for leniency when he walked into the police station on August 1, 1996, well over two years after the crime occurred. Also, the fact that he made a tentative identification of the defendant was not remarkable in view of the fact that Wilkinson lived in the area, claimed to know many gang members, and claimed to have seen the defendant on another occasion. Moreover, Wilkinson's benefit to the State as a witness did improve from August 1 to the date of trial. The witness was not completely certain in his attempts to identify the perpetrator until he made his in-court identification at trial. If the defense had known the full extent of the payments and relationship involved in this case, it could have argued more forcefully that the witness's identification was influenced by the consideration received in the interim between the police statement and the trial.

In *Bagley*, the defendant filed a discovery motion requesting the State to provide information on " 'any deals, promises or inducements made to [government] witnesses in exchange for their testimony.' " *Bagley*, 473 U.S. at 669-70, 87 L. Ed. 2d at 486, 105 S. Ct. at 3377. The government responded that there had not been any deals, promises, or inducements. After his trial and conviction, however, the defendant discovered that after trial two key government witnesses were paid $300 each pursuant to informant contracts that were signed before trial. *Bagley*, 473 U.S. at 671-72, 87 L. Ed. 2d at 487, 105 S. Ct. at 3378. The Supreme Court noted that the government's response misled defense counsel into believing that the government's witnesses could not be impeached. *Bagley*, 473 U.S. at 683, 87 L. Ed. 2d at 495, 105 S. Ct. at 3384. Accordingly, the Court remanded the cause to the Court of Appeals for the Ninth Circuit for a determination of whether there was a reasonable probability that, had the inducement offered by the government to its witnesses been disclosed to the defense, the result of the proceeding would have been different. *Bagley*, 473 U.S. at 684, 87 L. Ed. 2d at 495, 105 S. Ct. at 3384-85.

On remand in *Bagley*, the Court of Appeals for the Ninth Circuit noted that the relevant inquiry was not how the particular trial judge would subjectively evaluate the undisclosed or false evidence but, rather, how the absence of the evidence might have affected the outcome of the trial from an objective standpoint. *Bagley v. Lumpkin*, 798 F.2d 1297, 1301 (9th Cir. 1986). In reversing the defendant's conviction, the court of appeals then concluded that, if the defendant had known of the informant contracts showing bias or incentive to testify falsely, he might not have waived his right to a jury trial. *Bagley*, 798 F.2d at 1301. The court further concluded that the evidence bore directly on the witnesses' bias to testify falsely and therefore the failure to disclose undermined confidence in the outcome of the trial. *Bagley*, 798 F.2d at 1302.

We believe that *Bagley* is strong support for the conclusion in this case that the State was required to disclose any cash payments made to Wilkinson after he became a witness and prior to trial. Although Gauer denied that the payments made to Wilkinson were given in exchange for testimony, the defendant was nonetheless entitled to know the full extent of money given to Wilkinson by the police for any reason. The defendant was also entitled to know of the full extent of the relationship between Gauer and the State's key witness so that it could fully explore the possible bias on the part of that witness that might have affected his testimony against the defendant.

We also find *People v. Aguilar*, 218 Ill. App. 3d 1 (1991), to be supportive of the defendant's position. There, the arresting officer in an illegal drug case gave surprise testimony on cross-examination that he had paid his informant cash for assistance in arranging the drug transactions in question. *Aguilar*, 218 Ill. App. 3d at 9. Thereafter, the defendant moved to dismiss the indictment, citing his pretrial discovery request for the State to disclose any consideration of any kind in exchange for, or in relation to, testimony. *Aguilar*, 218 Ill. App. 3d at 9. The trial court denied the motion but granted the defendant a six-week continuance. *Aguilar*, 218 Ill. App. 3d at 9. On appeal, the court analyzed the case in terms of deciding the appropriate discovery sanction under Supreme Court Rules 412(c) and (f) (73 Ill. 2d Rs. 412(c), (f)). *Aguilar*, 218 Ill. App. 3d at 9-11. The court observed that the defendant suffered prejudice because, if he had timely received the information, he may have elected a jury trial over a bench trial. *Aguilar*, 218 Ill. App. 3d at 10. The court then reversed and remanded the cause for a new trial. *Aguilar*, 218 Ill. App. 3d at 11.

As in *Aguilar* and *Bagley*, we find that the defendant may have opted for a jury trial if he had timely received the information discussed above. Accordingly, we find that the cause must be remanded for a new trial and for the defendant to decide whether he wants to exercise his right to a trial by jury.

The defendant's second argument on appeal is that he is entitled to a new trial based on the newly discovered evidence that he claims was testified to by Gauer, Peterson, Sanchez, and George during the hearing on the defendant's posttrial motion. The defendant maintains that this evidence could not have been presented at trial and that it would have likely affected the outcome. Given our resolution of the first issue on appeal finding that the defendant's conviction must be reversed and the cause remanded for a new trial, we find it unnecessary to address the defendant's newly discovered evidence argument.

The defendant's final argument on appeal is that the State failed to prove him guilty beyond a reasonable doubt. Specifically, the defen-

dant contends that his own statement to the police established only that he was an observer of the May 15, 1994, murder and not a participant in the shooting. The defendant also contends that Wilkinson's testimony was inherently incredible because (1) Wilkinson made a statement naming Rudy Vallez as the shooter in another shooting at the same location but the statement was initially placed in the Lesure file; (2) Wilkinson failed to identify the defendant in a photographic array and a live lineup; (3) Wilkinson's account differed from Darryl Bailey's account of the shooter in that Bailey saw only one suspect and he described the shooter as wearing red shorts; (4) Wilkinson waited until two years after the murder and until he had a felony pending in Kane County to come forth with information on the murder; and (5) Wilkinson lacked credibility because he had three prior felony convictions.

■ A reviewing court will not reverse a conviction unless the evidence is so improbable that a reasonable doubt of the defendant's guilt is justified. *People v. Moore*, 171 Ill. 2d 74, 94 (1996). The relevant question on review is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the elements of the offense beyond a reasonable doubt. *Moore*, 171 Ill. 2d at 95. A single witness's identification of the accused is sufficient to sustain a conviction if the witness viewed the accused under circumstances permitting a positive identification. *People v. Lewis*, 165 Ill. 2d 305, 356 (1995). The circumstances used in evaluating identification testimony include (1) the opportunity the witness had to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty the witness demonstrated in the identification process; and (5) the time between the crime and the identification. *People v. Slim*, 127 Ill. 2d 302, 307-08 (1989).

■ Here, we note that, in viewing the evidence in the light most favorable to the prosecution and deferring to the trial court's resolution of the credibility question in favor of the State's witnesses, it is apparent that Wilkinson observed the defendant firing the weapon across New York Street at the time of the offense. Wilkinson then observed the defendant run past him. At that time, there was ample lighting, and Wilkinson observed the suspect from a relatively close distance while displaying a great deal of attention. We also note that the defendant's own statement placed him at the scene, and the diagram showing the placement of the shooting victim tended to indicate that the defendant had been on the west side of the building on the corner of New York and Fourth Streets, which would have been the exact location from which the fatal shots were fired. Additionally,

Wilkinson observed the defendant the very next day talking about the shooting and how the weapon used in the crime had been hidden. Wilkinson then picked the defendant out of a photographic lineup more than two years after the offense, stating that the defendant's picture "looked just like the guy." Although Wilkinson failed to write the defendant's number down at the live lineup, it appears that Wilkinson expressed some indication at that lineup that the defendant may have been the shooter. Regarding the length of time between the commission of the crime and the identification, we note that Wilkinson was certain about his in-court identification, and the lapse of time went only to the weight to be given the testimony, which was a question for the trier of fact to resolve. See *People v. Rodgers*, 53 Ill. 2d 207, 214 (1972) (two-year lapse in identification upheld); *People v. Dean*, 156 Ill. App. 3d 344, 352 (1987) (2½-year lapse upheld), *overruled on other grounds*, *People v. Jackson*, 149 Ill. 2d 540, 553 (1992). The identification issue was for the trial judge, as the trier of fact, to resolve, and his determination was supported by the evidence.

The defendant also relies on Wilkinson's prior felony convictions and various discrepancies and inconsistencies in the record. After a careful perusal of the record, we have concluded that the discrepancies and inconsistencies did not create a reasonable doubt of guilt. Moreover, it was within the province of the trier of fact to weigh the credibility of the various witnesses and to determine the weight afforded their testimony. Since we have found that the evidence presented at the defendant's trial was sufficient to sustain the defendant's conviction beyond a reasonable doubt, a subsequent retrial will not subject the defendant to double jeopardy. See *People v. Taylor*, 76 Ill. 2d 289, 309 (1979). Our holding, however, does not constitute an implication as to the defendant's guilt or innocence that would be binding on retrial. See *Taylor*, 76 Ill. 2d at 310.

■ Lastly, we note that the State filed a motion on appeal to strike a portion of the defendant's argument in his reply brief relating to the reasonable doubt issue. We took that motion with the case. We now find that our resolution of the reasonable doubt issue in favor of the State renders moot the State's motion to strike the defendant's argument.

For all of the foregoing reasons, the judgment of the circuit court of Kane County is reversed, and the cause is remanded for a new trial.

Reversed and remanded.

INGLIS and HUTCHINSON, JJ., concur.