No. 2--00--1391 

______________________________________________________________________________

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

______________________________________________________________________________

THE PEOPLE OF THE STATE ) Appeal from the Circuit Court

OF ILLINOIS, ) of Winnebago County.

)

Plaintiff-Appellee, ) 

) 

v. ) No. 99--CF--1657

)

BRIAN G. BENNETT, ) Honorable

)
 Rosemary Collins,

     Defendant-Appellant. ) Judge, Presiding.

_________________________________________________________________________ 
                   

JUSTICE KAPALA delivered the opinion of the court:

After a bench trial in the circuit court of Winnebago County, defendant, Brian G. Bennett, was convicted of the murder of Gerald Baertschi.  The trial court sentenced defendant to 50 years' imprisonment.  Defendant appeals, raising the following contentions: (1) that the State presented insufficient evidence to sustain his conviction of first-degree murder; (2) that he did not knowingly and intelligently waive his right to a jury trial; (3) that the trial court's findings were inconsistent; and (4) that the trial court abused its discretion in sentencing him to 50 years' imprisonment.  We affirm.

I. FACTS

Defendant was charged by indictment with first-degree murder (720 ILCS 5/9--1(a)(2) (West 1998)), reckless homicide (720 ILCS 5/9--3(a) (West 1998)), and failing to report an accident involving personal injury or death (625 ILCS 5/11--401(b) (West 1998)).  The charges arose out of an incident in which defendant struck Gerald Baertschi, a pedestrian, with his automobile at Viking Lanes bowling alley in South Beloit.

Before trial, the State filed a motion 
in
 
limine
 seeking, among other things
, an order allowing the State to introduce testimony that defendant was very angry just prior to the action that caused the victim's death.  The trial court ruled on the State's motion as follows:

"The court will allow the State to bring out evidence as listed in their Motion in Limine, except that with respect to number 5, the defendant's mental state, rather, they can testify to what they saw, what they saw and heard, but not what his mental state was."

Subsequently, defendant appeared in open court with his counsel and waived his right to trial by jury.

The evidence presented at trial, including large aerial photographs, indicated that Viking Lanes is a single-story brick building that faces east.  The building has two entrances on its east side.  The main entrance to the bowling alley is north of the second entrance into the bar.  Directly in front of the building is a large parking lot with five rows of painted parking stalls. The parking lot has traffic lanes between the rows of parking stalls as well as lanes for traffic running in front of the building and at the back of the lot.  There are two ways in and out of the parking lot, one away from the building in the northeast corner and one close to the front of the building in the northwest corner of the lot.

At trial, the State called Cheryl Nelson, who testified that she and her sister went to Viking Lanes on the night in question.  Nelson said that as she and her sister were walking toward the main entrance to the bowling alley she heard car tires squeal.  As Nelson and her sister were approaching the traffic lane between the parking places and the building, Nelson saw a car approaching.  Nelson ran across the traffic lane to the building, but her sister backed up rather than following her across.  As Nelson got to the other side of the traffic lane, she saw a large man being hit by a white car.  Nelson indicated that when the car hit the man it spun him and he ended up on the windshield of the car.  According to Nelson, when the man was on the hood and windshield of the car he covered about half the car.

On cross-examination, Nelson indicated that the white car came down the center aisle in the parking lot and turned right at the end of the row of cars.  It was at that point that she saw the man spin around and land on the car.  Nelson assumed the car hit him in the lower part of his legs.  The actual point of impact was too low for Nelson to see.  Nelson did not know what position the man's hands were in right before the car hit him.  Nelson said that she did not see anyone right next to the man when he was hit but also said, "I am not saying anyone wasn't there either ***."

The State's next witness was Nelson's sister, Nola Hathorn.  Hathorn said that when she and Nelson got up to the front of the parking lot and approached the lane where cars drive past the building, Nelson said, "Get out of the way."  Hathorn stepped back and Nelson ran across.  Hathorn saw a car pull around and hit a man.  Hathorn said, "It hit this gentleman--he was standing sideways--kind of from behind."  Hathorn related that the car traveled for a distance with the man on the hood, the man fell off at her feet, and the car kept going.  The man was on his back when he was on the car's hood and windshield and it looked like he took up the whole hood of the car.  Hathorn said the car didn't seem to slow down at all; it just kept going.

On cross-examination, Hathorn indicated that the car hit the man in the back of his legs, from behind.  Hathorn said that the man did spin a little before landing on the car.  Hathorn did not notice how the man's hands were when he was struck, but she did notice that there was a man standing very close to him when the car struck him.

The decedent's wife, Carol Baertschi, testified that on the night in question she was the janitor at Viking Lanes.  Carol said that she and her husband Gerald Baertschi arrived at the bowling alley that night and she saw defendant fighting with "one of the [Van Fleet] twins."  Carol yelled at them, and they quit.  Carol explained that the Van Fleet twins were regulars at the bowling alley, and they knew she worked there.  After exchanging some words with defendant, the twins went into the main entrance of the bowling alley.  As Carol was standing in front of the main entrance, the twins came back outside and had more words with defendant.  A lot of people came out of the bar, including Rich Anderson, the bartender, who was a friend of both Carol and the decedent.  Carol said that defendant ran to his car and came back with a pipe or rod in his hand and was going to go after the twins with it.  Some people whom Carol did not know told defendant to put the pipe down and to "knock it off."  Carol testified that Anderson, her husband, and some people that were with defendant walked defendant to his car to get him to leave.  Words were still being exchanged between defendant and the twins as defendant was being escorted to his car.  Carol said her husband and Anderson walked back toward the building through the parked cars.  Carol testified that a white car traveling really fast with its lights off hit her husband.  Her husband rolled on the top of the car and fell off.  The car took off.  Anderson flagged someone down to follow the car while Carol ran out to her husband. 

On cross-examination Carol indicated that the shirt of one of the twins had been ripped off.  She did not see any blood on defendant.  Carol said that her husband was at the end of the row of parked cars when he was hit, and Anderson was right next to him.  Carol said that her husband was looking at her and about to cross the traffic lane between the rows of parked cars and the bowling alley when he was hit.  Carol said that the car hit her husband on his left side.

Mary Garza testified that on the night in question a swerving car pulled out from Viking Lanes in front of her vehicle.  A man ran out and said, "[F]ollow that car, he just hit somebody."  The car headed east on Blackhawk Boulevard, stopped and let two people out, and then turned right, heading out of town.  Garza followed the car and got the license plate number. 

Beloit paramedic Michael Accardi testified that on the night in question he was off duty and was picking up his daughter at Viking Lanes.  When he arrived, Accardi drove past the front door and noticed somebody with a long, brightly colored object in his hand.  According to Accardi, the person holding the object "was quite irate, and he looked mad," while yelling at someone.  Accardi parked in the rear of the lot waiting for his daughter and he heard tires screech and saw a man fall off the top of a car.  Accardi did not see the man get hit by the car but believed the man was in the traffic lane right in front of the building when he was hit.  Accardi went to the man and found him unconscious but breathing.  Accardi believed the man to be seriously injured and directed someone to call an ambulance.

Sergeant Richard King of the South Beloit police department testified that on the night of the incident he was dispatched to an address in Rockton to locate a vehicle with a certain license number.  At approximately 1:15 a.m., Sergeant King knocked on defendant's door, but no one answered.  Sergeant King located a white, four-door Chevrolet Corsica.  The Corsica was damaged, including a smashed windshield on the passenger side.  Sergeant King had crime scene technicians dispatched to the scene, and the vehicle was towed to the garage at the South Beloit police department.  Sergeant King also testified that defendant did not report an accident within an hour of the incident at Viking Lanes.

Other testimony presented by the State established that a search of the trunk of the Corsica revealed a club that appeared to be a jack handle.  No latent fingerprints were found on the jack handle.

Jamie Rykowski testified that he was at the bar in Viking Lanes on the night in question.  Rykowski went outside to the parking lot and saw a fight starting, but he did not see any blows exchanged.  According to Rykowski, defendant went to his car and got a "night stick or something."  Rykowski said defendant was threatening the Van Fleet twins with the object.  According to Rykowski, defendant was in a bad mood and was ready to beat up the Van Fleets.  Rykowski said that Anderson and Baertschi were trying to break up the fight and get defendant to leave.  Someone who was with defendant got him into a car.  Rykowski said that defendant backed the car out really fast and then slammed it into drive.  Defendant drove toward Anderson and Baertschi.  Defendant's car came around the corner at the end of the row of cars and hit Baertschi.  Rykowski indicated that the car narrowly missed Anderson.  No one else was standing near Baertschi and Anderson when Baertschi was hit.  According to Rykowski, before he was hit, Baertschi was trying to get defendant to stop the vehicle.  When defendant's car hit Baertschi, he flew up on the passenger side of the car and hit his head on the windshield.  When Baertschi fell off the car, he hit his head on the pavement.  Rykowski said the defendant may have hit the brakes just a "hair," causing Baertschi to fall off the car, and then defendant "just took off."

On cross-examination, Rykowski said that Anderson had walked up the aisle between the rows of parked cars "a little bit" toward defendant and his car in an effort to get defendant to leave.  Rykowski indicated that Baertschi walked out to help Anderson.  Anderson was walking back toward the building and Baertschi met Anderson at about the point where Baertschi ultimately was hit by defendant's car.  Rykowski said that defendant's car hit Baertschi "right in the front, towards his waistline."  Rykowski testified that Baertschi was facing the car when it hit him.  Rykowski also said that Baertschi was right on the edge of the row of parked cars when defendant's car struck him.  Rykowski said that Baertschi had his arms out trying to get defendant to stop his car and said, "Stop."  According to Rykowski, just before hitting Baertschi, defendant veered the car to the right leaving Baertschi with no time to get out of the way.  Rykowski did not see any injuries on defendant. 

Detective Rocco Wagner of the Winnebago County sheriff's department testified that he went to defendant's apartment the morning after the incident because defendant's wife reported the white Corsica stolen.  Detective Wagner observed defendant at his apartment that morning and saw no injuries above his eyes.  A photograph of defendant taken that day was admitted into evidence.  Detective Wagner indicated that defendant did not report the accident occurring at Viking Lanes to any police agency.  

On cross-examination, Detective Wagner agreed that on the day after the incident at Viking Lanes defendant had a red mark on his cheek, a bruise on his right arm, and an injury to a finger on his right hand.

Richard Anderson testified that on the night in question he was a part-time bartender at Viking Lanes but was not working that night.  Around 10:30 p.m., Anderson went outside to the parking lot and saw his friend Baertschi breaking up a fight between defendant and the Van Fleet twins.  Baertschi had the fight pretty well broken up, but defendant and the twins were still swearing at each other.  Anderson said two people were trying to control defendant.  Anderson told the people to remove defendant from the premises or the police would be called and defendant would be arrested.  Defendant went to a car and returned with a red club.  Anderson said that defendant "started pointing towards [Baertschi] and saying that he would kick his fat F'ing ass."  According to Anderson, defendant was approximately 15 feet from Baertschi at the time, and he was shaking the red pipe or jack handle at Baertschi.  Anderson indicated that defendant's mood was "extremely irate, uncontrollable."  Anderson testified that the people with defendant tried to calm defendant down.  Anderson and Baertschi asked them to get defendant to the car and get him out of the parking lot.  The people with defendant walked him to the car while Anderson and Baertschi walked behind them to make sure defendant left.  

According to Anderson, defendant got into the driver's side of the car and two people got into the car with him.  Anderson said that he observed defendant back the car out of its spot, stop the car, and turn the car's wheels as if he were going to leave by way of the northeast exit at the rear of the parking lot.  Next, the car's wheels turned toward the building in the direction of Baertschi and Anderson.  Anderson looked at Baertschi and said, "[W]e better get out of the way."  Defendant's car came toward them, Baertschi put his hands up, yelled "[S]top," and indicated by pointing that defendant should turn around and leave the other way.  Anderson said that defendant "floored the white Corsica" and Baertschi attempted to move over toward him.  Anderson said that when Baertschi realized he could not get out of the way, he stopped, raised both of his hands, and said, "[S]top."  According to Anderson, at that point, defendant "swerved hard to the right and struck Baertschi."  Anderson indicated that defendant swerved directly at Baertschi.  Anderson also said that he was standing right next to Baertschi when Baertschi was hit.  In fact, the passenger-side mirror of the vehicle grazed Anderson's arm as the car passed.  Anderson testified that no one else was near him and Baertschi at that time.  Anderson said that defendant was smiling as he drove into Baertschi.

When the car hit Baertschi, Anderson heard the hood crunch and a loud thud as Baertschi hit the windshield.  Defendant continued around the corner with Baertschi on the windshield for 15 to 20 feet.  Anderson said Baertschi rolled off the car.  According to Anderson, defendant did not slow down after hitting Baertschi, and the tires of the car were squealing as it hit him.   Anderson said that he told a lady to follow defendant's car and to get the license plate number.

On cross-examination, Anderson agreed that when he first spoke to the police about the incident he told them that the club was blue.  Anderson also agreed that his first written statement to the police did not mention that defendant approached Baertschi with the club and threatened him, that defendant smiled as he drove his car toward Baertschi, that defendant's car's tires squealed, or that the passenger-side mirror grazed his arm.  Anderson indicated that neither he nor Baertschi went all the way out to where defendant's car was parked; they just went in that direction.  Anderson testified that, in the second written statement he gave to the police, he told the police about the threat defendant made to Baertschi.  When asked, Anderson said no cars were parked behind defendant's car when defendant backed his car out of its parking spot.

Dr. Lawrence Blum, a forensic pathologist, testified that he reviewed the autopsy report, ambulance report, and autopsy photographs and opined that the car struck Baertschi's right hip, as indicated by the bruise on his hip.  Dr. Blum did explain, however, that the bruise could have been the result of a secondary impact or possibly was already present before the incident.  Dr. Blum opined that Baertschi died from neurogenic shock due to blunt force impact resulting from a motor vehicle collision.

After defendant's motion for a directed finding was denied, defendant testified on his own behalf.  According to defendant, he picked up his brother on the night in question at their mother's house.  Defendant said they went to the bar at Viking Lanes to celebrate his brother's and sister's birthday.  Defendant testified that he drank four beers at his mother's house and then one and a half beers at Viking Lanes.  Defendant said that he was not drunk.

Defendant testified that as he left the Viking Lanes bar he was attacked outside by several individuals.  According to defendant, an individual hit him in the left jaw, causing a cut, and when defendant tried to fight back, he was hit from behind in the back of the head, causing him to fall down.  Defendant stated that while he was on the ground he was kicked in the ribs and arms,  that when his sister came out of the bar the beating stopped and he ran to his car in the parking lot, that people from in front of the bar followed him, and that when he got into his car he was hurt, shaking, and scared.  Defendant claimed that he had a cut near his left eye that was bleeding and impaired the vision in his left eye.

Defendant testified further that he backed his car out of its parking space and proceeded back toward the building intending to use the parking lot's northwest exit.  Defendant explained that he did not leave by way of the parking lot's northeast exit, which was away from the building, because the parking spots were at an angle and he was unable to point the car toward that exit without hitting the car parked in the space behind him.  Defendant said that his sister was standing on the corner, guiding him, because there was a crowd of people in front of the building to his left.  Defendant said that as he came through the area in front of the building there was a crowd of people dispersing and people were yelling for him to stop his vehicle.  Defendant testified that he heard a "little thump" and thought someone hit his vehicle with a bottle or an object.  Defendant claimed that, "because [he] was driving out, [he] was looking to the left where the majority of the people were."  Defendant said that he had no knowledge that there were people to his right because "[he] was watching the crowd to the left, so [he] didn't hit any pedestrians."  Defendant testified that he was traveling, at most, 15 miles per hour in the parking lot.  Defendant said that after he heard the thud or bump he proceeded out of the parking lot and went directly home.  Once at home, defendant parked the car in front of his apartment, went inside, and told his wife that he had been jumped at the bowling alley.  Defendant said he and his wife wiped the blood off of his injuries.  The next morning, defendant's wife told him that their car was missing.

Defendant testified that he did not know Baertschi, that he never had a club in his hand that night, that his father and brother were at Viking Lanes that night and both looked like him, and that no one was in the car with him when he left Viking Lanes.

The trial court found defendant guilty on count I alleging first-degree murder and count III alleging failing to report an accident involving personal injury or death.   The trial court specifically found
 that defendant's testimony that he did not deliberately try to hit Baertschi was not credible.  Defendant filed no posttrial motions.

After a sentencing hearing, the trial court sentenced defendant to 50 years' imprisonment for first-degree murder, imposed no sentence for failing to report an accident involving personal injury or death, and dismissed count II of the indictment.  Defendant's motion to reconsider sentence was denied.  Defendant now appeals.

II. DISCUSSION

A. SUFFICIENCY OF THE EVIDENCE

On appeal, defendant argues that the evidence presented at trial was insufficient to show that he acted knowingly,  and he therefore asks this court to reduce his first-degree murder conviction to a conviction of reckless homicide.  The State argues that the evidence was sufficient to prove beyond a reasonable doubt that defendant had the requisite intent to sustain a conviction of first-degree murder, and therefore we should not reduce defendant's conviction to a less serious offense.  We agree with the State. 

It is not our function to retry a defendant when considering a challenge to the sufficiency of the evidence of his guilt.  
People  v. Collins
, 106 Ill. 2d 237, 261 (1985).  The relevant inquiry in reviewing the sufficiency of evidence is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  
People v. Perez
, 189 Ill. 2d 254, 265-66 (2000).

To sustain a charge of first-degree murder, as charged in this case, the State had to prove beyond a reasonable doubt that (1) defendant performed the act that caused the death of Baertschi, and (2) when defendant did so he knew his act created a strong probability of death or great bodily harm to Baertschi.  See 720 ILCS 5/9--1(a)(2) (West 1998).  It is unnecessary to directly prove that defendant had the intent to murder or do great bodily harm;  all that needs to be shown is that defendant voluntarily and willfully committed an act, the natural tendency of which was to cause death or great bodily harm.  
People v. Stevens
, 324 Ill. App. 3d 1084,
 1093 (2001).

Defendant contends on appeal, as he did in the trial court, that he hit Baertschi with his car accidentally and therefore did not have the requisite mental state to be convicted of first-degree murder.  The mental state with which an act is committed may be inferred from the act itself and the surrounding circumstances.   
People v. Patterson
, 314 Ill. App. 3d 962, 969 (2000).  The trier of fact makes the factual determination regarding a defendant's mental state, and that determination will not be disturbed on review unless the evidence is so improbable that a reasonable doubt about defendant's guilt is raised.  
Patterson
, 314 Ill. App. 3d at 969.

The testimony of Anderson establishes, 
among other things, that (1) defendant threatened Baertschi while holding a jack handle shortly before hitting Baertschi with his vehicle; (2) defendant started to leave the parking lot by way of the exit farthest from Baertschi and Anderson and then changed direction and drove toward them; (3) defendant "floored" his car and swerved directly at Baertschi, who was standing with outstretched arms and was saying, "[S]top"; (4) defendant was smiling as he drove his car into Baertschi; and (5) defendant continued to drive with Baertschi up against his windshield for 15 to 20 feet and did not stop.  This testimony, viewed in a light most favorable to the State, was sufficient to show that defendant voluntarily and willfully drove his vehicle into Baertschi and therefore had the requisite mental state for first-degree murder.

Defendant highlights the fact that Anderson was the only witness to testify that defendant directly threatened Baertschi and that defendant was smiling as he drove into Baertschi.  Defendant points out that Anderson conceded he did not tell the police these things until he gave the police a second written statement several months after the incident.  Defendant also suggests that Anderson was biased because Baertschi was his good friend.

The trial court was made aware of these points and chose to believe Anderson's testimony and not to believe defendant's contention that the collision was an accident.  In a bench trial, it is the responsibility of the trial court to judge the credibility of the witnesses.  
People v. Connolly
, 322 Ill. App. 3d 905, 919 (2001).  We must give due deference to these conclusions.

Inconsistency between certain eyewitnesses' testimony does not necessarily establish reasonable doubt.  See 
People v. Baldwin
, 256 Ill. App. 3d 536, 542 (1994).   
The record shows that the witnesses' statements were generally consistent and varied only in minor respects, which is to be expected anytime several persons witness the same event under traumatic circumstances.  See 
People v. Brooks
, 187 Ill. 2d 91, 133 (1999).   After carefully reviewing the record, we do not believe these inconsistencies and conflicts were such that a rational trier of fact could not have found defendant guilty beyond a reasonable doubt.  Accordingly, we believe defendant was proved guilty of first-degree murder beyond a reasonable doubt.  Therefore, we decline to reduce defendant's conviction to a conviction of reckless homicide. 

B. WAIVER OF RIGHT TO TRIAL BY JURY

Defendant argues that he did not knowingly or intelligently waive his right to trial by jury.  Defendant contends that, at the time he waived his right to a jury trial, the trial court had entered a pretrial order prohibiting the State from presenting testimony as to defendant's mental state and that order was not enforced at trial.  Defendant points out that at trial  Anderson testified that defendant appeared "extremely irate, uncontrollable," when he held the club and threatened Baertschi;  Accardi testified that the person who was holding the club appeared to be  "[q]uite irate, and he looked mad."  Defendant claims that the trial court considered this evidence in finding defendant guilty of first-degree murder.  Defendant argues that the trial court's noncompliance with the order 
in
 
limine
 rendered his waiver unknowing and involuntary.

The State argues that, because defendant did not object at trial to the mental state testimony or move to withdraw his waiver of his right to a trial by jury and failed to raise either issue in a posttrial motion, defendant has waived the issue on appeal.

In order to preserve an issue for review on appeal, defendant must object at trial and raise the issue in a posttrial motion.  
People v. Enoch
, 122 Ill. 2d 176, 186 (1988).  The plain error rule permits a reviewing court to consider issues that have been waived by the accused when the evidence is closely balanced or when the error is so fundamental and of such magnitude that the accused was denied a fair trial.  
People v. Lucas
, 151 Ill. 2d 461, 482 (1992).  The evidence in this case was not closely balanced.  However, our supreme court has held that, due to the importance of the right affected, a defendant may, in some cases, claim for the first time on appeal that his jury waiver was invalid even though the question was not raised in the trial court.  See 
People v. Smith
, 106 Ill. 2d 327, 333 (1985).  Accordingly, we will review this issue.

Defendant contends that his waiver of his right to a jury trial was invalid and involuntary because it was premised on a belief that the trial court would abide by an order 
in
 
limine
 precluding evidence from eyewitnesses regarding defendant's mental state before hitting Baertschi with his vehicle.  Defendant relies on 
People v. Norris
, 62 Ill. App. 3d 228 (1978), where, after opening statements at a bench trial, the trial court allowed the State to add five additional witnesses, including two previously unknown witnesses, one of whom was an eyewitness to the crime.  
Norris
, 62 Ill. App. 3d at 229.  The First District determined that defendant's jury waiver was not knowing and intelligent because, at the time defendant waived his right to a jury trial, he was unaware of the most damaging evidence against him.  
Norris
, 62 Ill. App. 3d at 233.

We believe that 
Norris
 is factually distinguishable from this case because here defendant cannot claim that he was unaware that the order regarding testimony as to his mental state was subject to change.  A trial court's ruling on a motion 
in
 
limine
 is an interlocutory order that is subject to reconsideration by the trial court at any time prior to or during trial.  
People v. Drum
, 321 Ill. App. 3d 1005, 1008 (2001).  Thus, at the time he waived his right to trial by a jury, defendant was not entitled to assume the trial court's order would remain the same.  Accordingly, we reject defendant's argument and find that defendant knowingly and intelligently waived his right to trial by a jury.

C. INCONSISTENT FINDINGS

Defendant's third argument on appeal is that he is entitled to a new trial because a guilty finding for first-degree murder is inconsistent with a guilty finding for failing to report an accident involving personal injury or death.  Defendant reasons that the charge of failure to report an accident involving personal injury or death applies only to occurrences involving an "accident," while the charge of first-degree murder in this case requires a knowing act.  Defendant's argument presumes that, because the term "accident" contemplates an unexpected event and the word "knowing" includes the conscious awareness of the existence of facts with a substantial certainty (see J. Decker, Illinois Criminal Law, A Survey of Crimes and Defenses §2.33, at 115 (3d ed. 2000)), the trial court made impermissible inconsistent findings in determining the defendant was guilty of both offenses.

The parties disagree on whether we should address this contention because no objection was raised at trial and defendant did not file a posttrial motion.  See 
Enoch
, 122 Ill. 2d at 186.  However, legally inconsistent verdicts present plain error, which is an exception to the general rule that issues not properly preserved for appeal are waived.  
People v. Fornear
, 283 Ill. App. 3d 171, 176
 (1996).  Accordingly, we will consider defendant's argument.

Guilty verdicts are legally inconsistent if they indicate the jury's finding of mutually inconsistent mental states relating to the same conduct.  
Fornear
, 283 Ill. App. 3d at 176.  Where inconsistent guilty verdicts are returned, the defendant is entitled to a reversal of the convictions and a new trial on all counts.  
Fornear
, 283 Ill. App. 3d at 176.  We see no legal inconsistency in finding defendant guilty of both first-degree murder and failing to report an accident involving personal injury or death.

In order to convict a defendant of first-degree murder, as charged in this case, the State must prove beyond a reasonable doubt that the defendant knew that his actions created a strong probability of death or great bodily harm.  720 ILCS 5/9--1(a)(2) (West 1998).  Section 11--401 of the Illinois Vehicle Code (625 ILCS 5/11--401 (West 1998)) is titled "Motor vehicle accidents involving death or personal injuries" and provides in relevant part:

"(a) The driver of any vehicle involved in a motor vehicle accident resulting in personal injury to or death of any person shall immediately stop such vehicle at the scene of such accident, or as close thereto as possible and shall then forthwith return to, and in every event shall remain at the scene of the accident until the requirements of Section 11-403 have been fulfilled.  Every such stop shall be made without obstructing traffic more than is necessary.

(b) Any person who has failed to stop or to comply with the requirements of paragraph (a) shall, as soon as possible but in no case later than one hour after such motor vehicle accident, or, if hospitalized and incapacitated from reporting at any time during such period, as soon as possible but in no case later than one hour after being discharged from the hospital, report the place of the accident, the date, the approximate time, the driver's name and address, the registration number of the vehicle driven, and the names of all other occupants of such vehicle, at a police station or sheriff's office near the place where such accident occurred.  No report made as required under this paragraph shall be used, directly or indirectly, as a basis for the prosecution of any violation of paragraph (a)."  625 ILCS 5/11--401 (West 1998).

Our supreme court has held "that to show a violation of section 11--401 the prosecution is required to prove that the accused had knowledge that the vehicle he was driving was involved in an accident or collision."  
People v. Nunn
, 77 Ill. 2d 243, 252 (1979).  In 
People v. Digirolamo
, 179 Ill. 2d 24 (1997), our supreme court recognized that section 11--401 does not expressly refer to the required mental state.  
Digirolamo
, 179 Ill. 2d at 38.  The 
court explained, however, that the State is required to prove that the defendant had knowledge that the vehicle he or she was driving was involved in an accident (
Digirolamo
, 179 Ill. 2d at 38-39) and that the defendant had knowledge that he or she was involved in an accident that involved another person (
Digirolamo
, 179 Ill. 2d at 42).

Accordingly, both crimes require a "knowing" mental state.  In finding defendant guilty of first-degree murder, the trial court found that defendant acted knowingly when he drove his vehicle into Mr. Baertschi.  In finding defendant guilty of failing to report an accident involving personal injury or death, the trial court found that defendant knew he was in an accident involving another person, left the scene, and failed to report the accident.  The trial court findings were not inconsistent.

Defendant's brief ascribes to the offense of failing to report an accident involving personal injury or death a requirement that the accident was unintentional.   Defendant restricts the definition of "motor vehicle accident" to an unintentional or inadvertent incident rather than defining it as a collision between a motor vehicle and an object or person without regard to the intentions of the parties involved.

Nowhere in the Illinois Vehicle Code is the term "motor vehicle accident" defined.  An undefined word in a statute must be ascribed its ordinary and popularly understood meaning.  
Texaco-Cities Service Pipeline Co. v. McGaw
, 182 Ill. 2d 262, 270 (1998).  If we were to accept defendant's reading of the statute, we would have to conclude that a motorist who intentionally caused a collision resulting in personal injury or death and who then fled the scene is under no duty to report the incident, while the motorist who was unintentionally involved in such a collision and leaves the scene is so required.  We must assume the legislature did not intend an absurd or unjust result.  
People v. Swartwout
, 311 Ill. App. 3d 250, 263 (2000).  
When a motorist knows that he or she was in a collision resulting in personal injury or death of a person and has left the scene, section 11--410(b) requires that the motorist report the accident to the police within the specified time period.  See 625 ILCS 5/11--401(b) (West 1998).  The statute does not concern itself with how the accident came about.  Moreover, various reported decisions have referred to the terms "accident" and "collision" synonymously.  See 
Nunn
, 77 Ill. 2d at 252; 
People v. Janik
, 127 Ill. 2d 390, 399 (1989); 
People v. Nodine
, 209 Ill. App. 3d 1031, 1036 (1991); 
People v. McCracken
, 179 Ill. App. 3d 976, 984 (1989).  Accordingly, we reject defendant's contention that the trial court's findings in this case were legally inconsistent.

D. SENTENCE

The last issue defendant raises on appeal is that the trial court abused its discretion in imposing a 50-year prison term because (1) it failed to consider in mitigation the fact that defendant was raised in a poor social environment, and (2) it considered in aggravation the death of the victim, a factor inherent in the offense of first-degree murder.  Defendant contends that because of these improprieties his sentence was excessive and he is entitled to a new sentencing hearing.  We disagree.

The trial court sentenced defendant to a prison term within the statutorily prescribed range of 20 to 60 years (730 ILCS 5/5--8--1(a)(1)(a) (West 2000)).  When the sentence chosen by the trial court falls within the statutorily permissible range, the sentence will not be disturbed on appeal absent an abuse of discretion.  
People v. Jones
, 168 Ill. 2d 367, 373-74 (1995).

While a defendant's family history, including abuse and exposure to violence during childhood, can be a mitigating factor at sentencing (see 
People v. Morgan
, 187 Ill. 2d 500, 543-44 (1999)), we do not believe that the trial court disregarded this factor in this case.  In fact, the record shows the contrary.

At the sentencing hearing, the trial court articulated facts contained in the presentence investigation report detailing the sexual assaults and violence defendant was subjected to as a youth.  The trial court concluded that these occurrences "may, in part, explain some of the anger that defendant has felt throughout the course of his life."  Defendant concedes that the trial court did acknowledge that defendant was raised in an atmosphere of violence but argues that the trial court did not consider this to be a mitigating factor because, at one point during the sentencing hearing, the trial court said, "I cannot find any factors in mitigation that are present in your case ***."  

After carefully reviewing the trial court's comment in context, it is clear that it was specifically referring to the statutory mitigating factors listed in section 5--5--3.1(a) of the Unified Code of Corrections (730 ILCS 5/5--5--3.1(a) (West 2000)).  Immediately after stating, "I cannot find any factors in mitigation that are present in your case ***," the trial court mentioned six of the mitigating factors listed in section 5--5--3.1(a) that could possibly have been applicable to the case.  Therefore, we believe that, in making the comment complained of, the trial court meant that there were no statutory mitigating factors, and not that there were no mitigating factors at all.  Accordingly, we reject defendant's contention that the trial court failed to consider his family background as a factor in mitigation.

Defendant also contends that the trial court improperly considered in aggravation the fact that the victim died as a result of his conduct, a factor that is inherent in the offense of first-degree murder.  The State argues that defendant has waived this issue because it was not raised in his motion to reconsider sentence.

Although defendant did not specifically assign the improper consideration of an aggravating factor as error in his motion to reconsider sentence, we may review as plain error a court's reliance on an improper factor in aggravation in sentencing because it affects defendant's fundamental right to liberty.  
People v. Pierce
, 223 Ill. App. 3d 423, 440-41 (1991).  Accordingly, we will address defendant's argument.

While it is true that a factor implicit in the offense of which defendant is convicted cannot be used as an aggravating factor at sentencing (
People v. Rissley
, 165 Ill. 2d 364, 390 (1995)), we do not believe that the victim's death was so considered in this case.  In support of his contention that the victim's death was considered as an aggravating factor, defendant points to the following comment made by the trial court during the sentencing hearing: "As I said, all life is precious, and you, in fact, did take a precious human life by your actions on this evening."   This general statement about the offense, however, does not establish the impropriety of which defendant complains.  See 
People v. Lake
, 298 Ill. App. 3d 50, 58 (1998) (general passing comments on the defendant's actions and consequences of those actions held not to constitute improper consideration of death as aggravating factor).  There is nothing in the record to suggest that the victim's death was considered in aggravation.  In fact, where the trial court did discuss the aggravating factors it considered, it referred to them as such.  Thus, we conclude that the trial court did not abuse its discretion in regard to sentencing defendant.

III. CONCLUSION

For the foregoing reasons, we affirm the judgment of the circuit court of Winnebago County.

Affirmed.

O'MALLEY and
 GROMETER
, JJ., concur.