2021 IL App (1st) 190192-U

SECOND DIVISION
May 4, 2021

No. 1-19-0192

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 16 CR 3088 |
| | ) | |
| SHAMAR McGEE, | ) | The Honorable |
| | ) | Carl B. Boyd, |
| Defendant-Appellant. | ) | Judge Presiding. |

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court.
Justices Lavin and Cobbs concurred in the judgment.

**ORDER**

*HELD*: Defendant's conviction for felony murder affirmed where claim of self-defense could not stand, as it was negated by the State beyond a reasonable doubt based on evidence demonstrating force was not threatened against him, he was the aggressor, he was not in imminent danger, the use of force was not necessary, he did not believe he was in danger, and such belief was not objectively reasonable. Correction to mittimus required.

¶ 1      Following a bench trial, defendant-appellant Shamar McGee (defendant) was convicted of three counts of felony murder and one count of aggravated discharge of a firearm. Counts were merged, and he was sentenced to 20 years for the felony murder convictions and 4 years for the aggravated discharge of a firearm conviction, to run consecutively, for a total of 24 years in prison. He appeals, contending that the State failed to prove beyond a reasonable doubt that he acted without legal justification. He insists that the testimony and evidence at trial supported his theory of self-defense and defense of others, and that the State did not present sufficient evidence to dispute these. He asks that we reverse his conviction outright. Alternatively, he asks that if we do not grant him the relief requested, we must nonetheless correct his mittimus to reflect only one conviction for felony murder. For the following reasons, we affirm, with a correction to defendant's mittimus.

¶ 2                                    BACKGROUND

¶ 3      Defendant was charged with multiple counts of felony murder, attempted murder, and aggravated discharge of a firearm in relation to events that occurred on the night of January 28, 2016. That evening, defendant was hosting a party for his birthday at his home, which was relatively intimate in size and consisted of approximately 10 to 15 attendees. The events at issue resulted in the injury of Anthony Evans and in the death of Troy Thompson.

¶ 4      Marcus Washington testified that he and defendant had a good relationship and were friends. He stated that Evans, his cousin, had a similarly good relationship with defendant, until recently when Evans stole defendant's gun. On the morning of the party, the group's friend in common, Johnny Tyra, told him it was defendant's birthday. Washington averred that he called defendant on the phone to wish him a happy birthday, whereupon defendant

2

invited him to his house that evening for the party. At about 9 p.m., Washington went to the party with Evans. Washington was unarmed, but Evans brought a gun with him; Washington explained that this was part of the "lifestyle" they led. The two walked into the party and saw defendant with several other people, including Johnny, his wife Britani, Quinn Davis, and Thompson. Washington averred that upon his and Evans' arrival, defendant stood up and told them to leave, saying "[y]ou stole from me." Washington turned around and walked out the front door, while Evan walked out backwards, facing defendant until he was outside. Washington averred that he and Evans remained calmed and did not act disrespectfully in any way as they left. At that moment, another partygoer, EJ, arrived; defendant let him inside and then the front door of the home was closed and locked.

¶ 5      Washington further testified that once outside, he and Evans began to walk down the driveway to leave. Washington then heard a gunshot from behind them. Evans pushed Washington to the ground, and Washington crawled under a parked truck, believing he had been shot. Washington stated he did not see who shot the gun, but he knew it came from behind him and from the house or near it. Washington then saw Evans pull out his gun and shoot one time toward the house. At this point, Johnny came out of the house, along with Davis and Thompson, to check on Washington, and as they were helping him up from the ground, Washington discovered that he had not been shot. Evans was now in the middle of the street, and Washington then saw defendant run toward them holding a gun; Washington described that defendant's gun had a 50-round extended magazine and was equipped with a red laser, which was on. Defendant fired five shots at Evans, and Evans returned fire and ran

down the street. Washington heard Johnny say that Thompson had been hit. Later, Washington called Evans on his phone and Evans told Washington he had been shot.

¶ 6        Evans corroborated much of Washington's testimony. He stated that he and defendant were not on good terms at the time of the incident because he had stolen defendant's gun and, following a mediation they had with friends, Evans had promised to pay defendant $500 for it and to stay away from him, but he had not yet paid defendant. Evans averred that he thought there would be no problem if he attended defendant's party, as he had had a drink with defendant since the mediation, and because Johnny had invited him. Evans went with Washington to the party armed, with his gun concealed in the left pocket of the hoodie he wore under his jacket, and he was let into the party by Johnny. When defendant saw them, he told them to get out. Evans stated that he and Washington were not disrespectful and they left, with him walking out the front door backwards, facing defendant until he was outside. Evans saw defendant grab a gun from Thompson's waist and cock it, telling EJ, who had just arrived, to punch Evans on his way out. EJ did not do so, but walked into the house, whereupon the front door was shut and locked.

¶ 7        Evans further testified that, as he and Washington were walking down the driveway and away from the house, he saw defendant shoot at him from the side of a garbage can on the side of the house. Evans pushed Washington to the ground and pulled out his gun; he saw defendant running toward the back door with his gun and Evans fired one shot, which hit the front storm door and shattered its glass. As defendant ran to the back of the house, Johnny, Thompson, and Davis ran outside the front door and checked on Washington, who was on the ground near a parked truck. Evans stated that after about three minutes, he saw defendant

4

rise from a crouched position, point his gun with its red laser, and fire at him again. Evans returned fire, firing three shots and running. Evans then heard one last shot from defendant's direction at the house, and he noticed he had been shot in the left foot.

¶ 8    Britani testified that she and her husband Johnny were friends with defendant and that Evans was Johnny's nephew, but she did not know Washington very well. She acknowledged that it was known among the group of friends that Evans and defendant were on bad terms because Evans had stolen defendant's gun. When Evans arrived that evening at the party with Washington, she was shocked to see them enter, as Evans was not welcome. Britani stated that upon their entry, defendant asked Washington and Evans to leave and, when they did not do so immediately, defendant became upset and raised his voice, telling them to get out. Britani confirmed that Washington and Evans remained calm, said nothing disrespectful, and left.

¶ 9    Britani further testified that she observed defendant becoming more upset and pacing in the house following Washington and Evans' departure. She then saw defendant run out the back door. About 40 seconds later, Britani heard multiple gunshots from two distinct guns outside the house; she believed they came from the front of the home. Following the shots, defendant ran back inside the house through the back door, and Britani saw that he was holding a black gun equipped with a red laser. When Johnny, Davis, and Thompson went outside through the front door, Britani saw defendant go outside through the back door again, holding his gun. Britani remained inside and, after about 30 seconds, she heard five more shots outside. Thompson then came back into the house, and when he stood against the wall and tried to catch his breath, he fell and slid down the wall to the floor; he had been shot.

5

Johnny and Davis, who were now also inside the house, rushed to aid Thompson and Britani called 911. Britani stated that she never went outside during the incident and did not see the shooting.

¶ 10    Detective Judith Powe testified that she and her partner investigated the incident that evening and spoke to Johnny, Britani, and Washington, but not defendant, who, by the time she arrived at the house, could not be located. Defendant eventually surrendered himself to police on January 31, 2016, whereupon he gave a video statement. This video was played in court during Detective Powe's testimony. In the statement, defendant claimed he stayed inside during the entire incident, that he never shot a gun that night, and that he did not see Washington or Evans with a gun at his house. Additionally, Detective Powe noted that defendant did not say anything with respect to whether he had a gun, whether he went outside after hearing the gunshots, whether he felt threatened at any time that night, or whether he believed he shot in self-defense.

¶ 11    Forensic evidence was also presented at trial. It is undisputed that Thompson died from a gunshot wound to the right arm and torso, and that he was shot with a .380 or 9 mm bullet. An evidence technician testified that the glass storm door on the front of the house had been shattered, a Buick parked in the driveway had a bullet hole, an SUV in the driveway had a strike mark, and the mailbox had bullet holes. He recovered three .40 caliber casings in the street in front of the house, one .40 caliber casing on the driveway near the SUV, a bullet from the Buick, and the bullet from Thompson's body. A ballistics expert testified that the four .40 caliber casings belonged to bullets fired from the same gun, which belonged to defendant. The bullet from the Buick and the bullet from Thompson were also both fired

from the same .380 or 9 mm gun, which belonged to Evans. Thus, there is no dispute that the bullet that struck and killed Thompson came from Evans' gun, as Thompson stood in between the gunfire exchanged between defendant near the house and Evans in the street.

¶ 12     Defendant presented the testimony of two witnesses on his behalf, Johnny and himself. Relevant to the issues in this cause, Johnny testified that he did not invite Washington or Evans to the party.

¶ 13     Defendant testified that he, Thompson, Washington, and Evans were all friends until Evans stole his gun. He did not invite either Washington or Evans to his party. He averred that when they arrived that evening, he asked them to leave repeatedly, and when they did not, he asked Johnny to tell them to leave. At that point, Washington and Evans started to leave. According to defendant, as they did so, he saw Washington mouth the words, "We'll light this b*tch up," and he saw Evans "kind of flash[]" the black handle and silver part of a gun he had on his person. Defendant averred that he did not see Evans holding the gun, but he had his hands in his pockets the whole time. Defendant testified he felt threatened by this, and after Washington and Evans walked out the front door, he slammed and locked it.

¶ 14     Defendant further testified that, again, although Evans was not holding a gun, he believed he and his friends were in danger, so he grabbed his .40 caliber gun from the house and went out the back door. As he stepped outside, Evans opened fire. Defendant averred that he returned fire and took cover on the side of a truck; he stated he fired only because Evans fired first. Then, Johnny, Davis, and Thompson came outside and defendant, along with the three of them, approached Washington, who was laying on the ground. Defendant claimed that as they were checking on Washington, Evans, who by this time was standing in the street, fired

two more shots at him. Defendant returned fire again, but when his gun jammed, he ran inside the house; he then saw Thompson enter the house after him.

¶ 15    Finally, defendant testified that he hid his gun outside after the shooting because he believed his bullet had hit Thompson, and he did not surrender to police until several days later. He admitted that he lied to police in several respects, including denying to them that he ever left his house during the gunfight, that he had a gun that night, and that he fired a gun. While he maintained to police that Washington and Evans were the aggressors, he admitted that he did not tell police that he felt threatened by them in any way. He further admitted that he lied to police because he wanted to avoid being charged with murder, and that he did, indeed, own a .40 caliber gun with a red laser. Additionally, defendant testified that no one forced him to go outside and he did not chase Evans to the street.

¶ 16    At the close of the evidence, the trial court found defendant guilty. The court acknowledged defendant's theory on the case, namely, that he was not the initial aggressor, that he did not fire the first shot during either round of the shootings, that it was Evans who did so, and that he went outside that evening to protect his house and his guests. However, the court stated that it was called upon to make credibility determinations in this regard and that, after "consider[ing] the weight of the testimony and the credibility of the parties," it found defendant's testimony in this regard to be "incredible" and "lack[ing in] veracity * * * [and] truthfulness." The court went on to examine both exchanges of gunfire as separate instances. With respect to the first, the court noted that defendant exited the house with a firearm and fired the first shot at Washington and Evans and, thus, that he "initiated this particular series of events." The court declared that while it did not believe defendant

intended to shoot Washington, "[w]ithout a doubt, he intended to shoot Anthony Evans." Next, the court noted that defendant retreated back into the house and exited a second time with a gun and "again, fired the first shot." The court found that this "dispels any notion of self-defense." Ultimately acknowledging that it was Evans' bullet that killed Thompson, the court nonetheless concluded that "it was all initiated by" defendant and, thus, his theory of self-defense could not stand.

¶ 17 Defendant filed a motion for a new trial. Upon its consideration, the trial court again affirmed that, in its view of the evidence, "the testimony indicated that [defendant] was not only the initial aggressor in this case, he was the person who shot first," and, accordingly, he "certainly cannot claim self-defense." The court sentenced defendant to 3 concurrent terms of 20 years based on 3 felony murder convictions and 4 years for aggravated discharge of a firearm, to run consecutively, for a total of 24 years in prison.

¶ 18                                                    ANALYSIS

¶ 19 On appeal, defendant contends that we must reverse his convictions outright because the State did not prove beyond a reasonable doubt that he acted without legal justification. He asserts that he was justified in using force to defend himself and his guests that night and that the evidence showed Washington and Evans were the aggressors and became objective threats. He further argues that the evidence showed Evans, not he, fired first, placing him and his guests in imminent danger of serious harm. He concludes that his actions provided a "reasonable response to the situation" and, thus, his conviction was improper. We disagree.

¶ 20 When a criminal defendant challenges the sufficiency of the evidence used to convict him, the standard of review is whether, when viewing the evidence in the light most

favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See *People v. Smith*, 185 Ill. 2d 532, 542 (1999); *People v. Hunley*, 313 Ill. App. 3d 16, 20 (2000). Courts of appeal will not retry the defendant. See *People v. Digirolamo*, 179 Ill. 2d 24, 43 (1997). Instead, the trial court, as the trier of fact in a bench trial, hears and sees the witnesses and, thus, has the responsibility to adjudge their credibility, resolve any inconsistencies, determine the weight to afford their testimony and draw reasonable inferences from all the evidence presented. See *People v. Steidl*, 142 Ill. 2d 204, 226 (1991); *Hunley*, 313 Ill. App. 3d at 21. This is true even with respect to testimony provided by a defendant on his own behalf; the trial court is not required to accept his version of events over competing versions or other evidence presented at trial. See *People v. Bobo*, 2020 IL App (1st) 182628, ¶ 46, citing *People v. Ortiz*, 196 Ill. 2d 236, 267 (2001); see also *People v. Villarreal*, 198 Ill. 2d 209, 231 (2001) (trier of fact is entitled to choose among conflicting versions of events).

¶ 21    We further note that conflicts and inconsistencies in the testimony of witnesses do not create reasonable doubt, especially if those inconsistencies are minor. See *People v. Adams*, 109 Ill. 2d 102, 115 (1985) ("[m]inor inconsistencies in the testimonies do not, of themselves, create a reasonable doubt"); *People v. Bennet*, 329 Ill. App. 3d 502, 513 (2002) ("[i]nconsistency between certain eyewitnesses' testimony does not necessarily establish reasonable doubt"). Such discrepancies go only to the weight that is to be afforded to their testimony (see *People v. Hruza*, 312 Ill. App. 3d 319, 326 (2000)), which is for the trial court here as the trier of fact to determine, not the reviewing court (see *People v. Vasquez*, 313 Ill. App. 3d 82, 103 (2000)). See *People v. Robinson*, 30 Ill. 2d 437, 440 (1964) ("minor

variations *** pointed to by defendant at most affect the credibility of the witnesses, a matter for the trial court's determination" in a bench trial); *People v. McPherson*, 306 Ill. App. 3d 758, 766 (1999) (judgment will not be reversed on appeal where testimony is merely conflicting); see also *People v. Deleon*, 227 Ill. 2d 322, 332 (2008) and *People v. Simon*, 2011 IL App (1st) 091197, ¶ 94 (it is in trial court's direct purview to adjudge credibility and resolve these inconsistencies, and a reviewing court may not substitute its judgement in this regard). Moreover, absent any affirmative indication in the record to the contrary, it is presumed that the trial court considered only competent evidence in reaching its verdict. See *People v. Gilbert*, 68 Ill. 2d 252, 258-59 (1977) (this is rebutted only with affirmative evidence in record); accord *Simon*, 2011 IL App (1st) 091197, ¶ 91. A conviction will not be overturned unless the evidence is so improbable or unsatisfactory as to create a reasonable doubt of guilt. See *People v. Brown*, 185 Ill. 2d 229, 247 (1998).

¶ 22        Justifiable use of force, to protect either oneself or others, is, of course, an affirmative defense. See 720 ILCS 5/7-14, 1(a) (West 2018). Pursuant to statute, a person is justified in using force against another when, and to the extent that he reasonably believes, such conduct is necessary to defend himself or others against another's imminent use of unlawful force. See 720 ILCS 5/7-1(a) (West 2018). In a situation, such as the instant cause, where a defendant uses force which is intended or likely to cause death or great bodily harm, he is justified in doing so "only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another, or the commission of a forcible felony." 720 ILCS 5/7-1(a) (West 2018).

¶ 23    Accordingly, the elements of self-defense are: (1) unlawful force threatened against the defendant, (2) the defendant was not the aggressor, (3) the danger of harm was imminent, (4) the use of force was necessary, (5) the defendant actually and subjectively believed a danger existed that required the use of the force applied, and (6) the beliefs of the defendant were objectively reasonable. See *People v. Gray*, 2017 IL 120958, ¶ 50, citing *People v. Lee*, 213 Ill. 2d 218, 225 (2004). In self-defense cases, all the surrounding circumstances are relevant in assessing whether the defendant's beliefs were reasonable. See, *e.g.*, *People v. Morris*, 162 Ill. App. 3d 1046, 1052 (1987); *People v. Florey*, 153 Ill. App. 3d 530, 536 (1987). Reasonable belief encompasses a defendant, acting as a reasonable man, believing that the described facts exist. See *People v. Harmon*, 2015 IL App (1st) 122345, ¶ 55. While the defendant need not exercise " 'infallible judgment' " in reacting to the circumstances presented to employ self-defense, he ultimately must use " 'reasonable judgment under the existing circumstances.' " *Harmon*, 2015 IL App (1st) 122345, ¶ 55, quoting *People v. Evans*, 259 Ill. App. 3d 195, 210 (1994). The use of deadly force is not justified as self-defense if the defendant uses more force than he reasonably believes is necessary to avert the danger. See *People v. Washington*, 2012 IL 110283, ¶ 35. And, a claim of self-defense cannot be argued when the defendant was the aggressor. See 720 ILCS 5/7-1 (West 2018); *People* v. *Jeffries*, 164 Ill. 2d 104, 127 (1995).

¶ 24    Once self-defense is raised as an affirmative defense to the offense charged, the State has the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense, in addition to proving the elements of the offense charged. See *Gray*, 2017 IL 120958, ¶ 50; *Lee*, 213 Ill. 2d at 224; accord *Harmon*, 2015 IL App (1st) 122345, ¶ 50

(burden of disproving the defendant's assertion of the existence of justification belongs to the State, which must do so beyond a reasonable doubt). Just as with the elements of the charged offense, it is the function of the trial court, as the trier of fact in a bench trial, when deciding a claim of self-defense, to assess the credibility of the witnesses (including the defendant), the weight to be given their testimony, and the inferences to be drawn from the evidence, along with resolving any conflicts or inconsistencies presented. See *Gray*, 2017 IL 120958, ¶ 51; *Lee*, 213 Ill. 2d at 225. And, the same standard of review applies: whether, after considering the evidence in the light most favorable to the State, any rational trier of fact could have found beyond a reasonable doubt that the defendant did not act in self-defense. See *Gray*, 2017 IL 120958, ¶ 51; *Lee*, 213 Ill. 2d at 225. Critically, if the State negates any one of the enumerated elements of self-defense, the defendant's claim of self-defense cannot stand. See *Gray*, 2017 IL 120958, ¶ 50; *Lee*, 213 Ill. 2d at 225.

¶ 25    Based on the record before us, we hold that the defendant's claim cannot stand, as the State clearly negated the elements of self-defense under the circumstances presented beyond a reasonable doubt.

¶ 26    Most significantly here, the trial court specifically found that defendant's testimony regarding what occurred and his belief that he properly used self-defense to protect himself and his party guests—namely, that force was threatened against them, he was not the aggressor, the danger was imminent, his use of force was necessary, and he actually believed a danger existed—was "incredible" and lacked any sort of "veracity" or "truthfulness." As the trier of fact here, this was undeniably within its purview to do, and the evidence presented supports its determination that defendant was not acting in self-defense.

13

¶ 27    Washington testified that he and Evans left the party when they were told to do so by defendant. They walked out the front door of the house and down the driveway, when Washington heard the first gunshot coming from behind him, *i.e.*, from the house they had just left. Accordingly, Washington's testimony was that defendant fired first, making him the aggressor and not Evans, who pushed Washington to the ground to protect him and then fired one time in response, hitting the glass storm door. The shooting stopped for a few moments as Johnny, Davis, and Thompson ran outside to check on Washington. However, Washington testified that the shooting started again, as this time, he watched defendant fire five more shots at Evans, who had moved to the street. Washington's testimony made clear that defendant was the aggressor.

¶ 28    Evans corroborated Washington's testimony. He testified that, although he was armed, he left the party upon defendant's request. He walked outside with Washington and down the driveway to leave when he saw defendant on the side of the house by some garbage cans with a gun. He stated that defendant fired one shot from that point at him; Evans pushed Washington to the ground, returned fire with one shot that hit the front storm door, and saw defendant run into the house via the back door. Johnny, Davis, and Thompson came outside to check on Washington and, after a few minutes, Evans saw defendant rise from a crouched position, point his gun with its red laser, and fire at him again. Evans returned fire and ran. Just as Washington, Evans' testimony made clear that defendant was the aggressor.

¶ 29    This testimony was further corroborated by Britani and the forensic evidence presented. Britani testified that Washington and Evans left the party when defendant ordered them to, and that they did so calmly and without saying anything threatening or disrespectful. Britani

described that after they left, defendant remained very upset and agitated about the situation, and she saw him run out the back door. Although she was not outside and did not see the shootings, Britani testified that only seconds after defendant left the house, she heard gunshots from two distinct guns and then saw defendant run back into the house through the back door holding a gun equipped with a red laser. After Johnny, Davis, and Thompson went outside through the front door, Britani saw defendant go outside through the back door once again, holding his gun. And again, seconds later, she heard five more shots. Forensically, four .40 shell casings were recovered from the scene, one from the driveway and three more from the street, all having been shot from defendant's gun. This indicates that during the incident, defendant moved from the area near the house where he must have exited to the street, pursuing Evans, who testified that was where he moved to after the first shooting exchange.

¶ 30    Defendant's testimony, meanwhile, does little to support his contention of self-defense, particularly when considered along with the testimony of Detective Powe. Detective Powe, who investigated the shootings and spoke with defendant only a few days later, testified that defendant told her he stayed inside all evening, never shot a gun, and never saw Washington or Evans with a gun at his house. Additionally, he never mentioned to her that he ever felt threatened that night or that he shot in self-defense. This, confirmed by defendant's own video statement after the shooting and presented to the court, negates any consideration that defendant was threatened or in imminent danger, or actually or subjectively believed he was threatened or in imminent danger, thereby requiring the use of force as self-defense.

¶ 31        The crux of defendant's argument on appeal is his citation to what he considers to be contradictions in the evidence presented which he claims demonstrate he was not the aggressor and he was in imminent danger from Washington and Evans, and in his conclusion that his response to the situation, *i.e.*, his actions of going outside and continuing to follow Evans after he left the house and driveway and ran down the street, was "reasonable" so that he could be "apprised of his whereabouts" in order to protect his guests.

¶ 32        First, the discrepancies defendant cites are menial, if even considerable, in light of the evidence presented, and they certainly do not warrant the outright reversal of his conviction. For example, he argues that the contradiction between Washington and Evans' testimony that Johnny invited them to defendant's party and Johnny's testimony that he did not do so proves that Washington and Evans, and not he, were the initial aggressors. He also claims that his own testimony that Washington mouthed the words, "We'll light this b*tch up," and that he saw Evans "kind of flash[]" the black handle and silver part of a gun further proves he was not the aggressor, and that once shots were fired, the situation "was fluid" so as to reasonably support a belief that Evans was a continuing imminent threat of harm. We fail to see how these "inconsistences" regarding how Washington and Evans came to be at the party or what they did before they left, which defendant admits they did without question, had any relevance to what happened once the shooting began outside. Moreover, we have already discussed at length that the trial court found defendant's testimony to be not credible and, frankly, untrue. We cannot, and most especially will not in this situation, disturb that finding.

¶ 33    Furthermore, there is simply no evidence here compatible with defendant's assertion of self-defense—not even his own testimony. Defendant verified during his testimony that when Evans was in the house, he was not holding a gun. He also testified that Washington and Evans did, in fact, leave when he told them to, and that he slammed and locked the front door as soon as they did. That should have been the end of this encounter.

¶ 34    Defendant, however, chose to pursue the situation by grabbing his .40 caliber gun equipped with a laser and going outside the back door to follow Washington and Evans as they were leaving down the driveway. Again, defendant admitted that Evans was not holding a gun. Yet, he testified that he somehow believed at this point—in a locked house, with the alleged threat having left the premises and walking away down the driveway—he and his friends were in danger, and that is why he went outside, armed. It is clear to us that the situation, however contentious or threatening it may or may not have been inside the house, had certainly deescalated the moment Washington and Evans left and defendant locked the door. The fact that defendant pursued them by going outside the back door with his gun not once, but then came back inside and went out again a second time while armed—after any conceived threat had departed—cannot support a claim of self-defense.

¶ 35    What is more, even if defendant's use of force could somehow be justified here, which it simply cannot, it certainly was not reasonable for him to believe that firing multiple gunshots at Washington and Evans was necessary to avert the "danger" they posed in his view. That the situation became "fluid," as defendant states, is a complete mischaracterization. The situation was over when he shut and locked the door; he chose to go outside after growing more upset and agitated. We understand defendant's point that one exercising self-defense

need not do so with "infallible judgment" in reaction to the circumstances presented. But, self-defense does require that a defendant act as a reasonable man, and that, in turn, requires the use of reasonable judgment under the existing circumstances. See *Harmon*, 2015 IL App (1st) 122345, ¶ 55, quoting *Evans*, 259 Ill. App. 3d at 210. Even were we to believe defendant acted as a reasonable man (which we do not), he most certainly used more force than was reasonably necessary to avert the danger he (may have) perceived. Even were we to believe his claim that he was not the aggressor (which, again, we do not), this, alone, renders his use of deadly force in this situation unjustifiable as self-defense.

¶ 36    In sum, the evidence demonstrates that defendant did not act with an objectively reasonable belief in the need for self-defense when he shot at Washington and Evans outside after they left the party, and again a second time after going inside and returning outside and shooting at Evans, who by this time had moved away from the house and was down the street. After viewing the evidence in the light most favorable to the State, we conclude that a rational trier of fact could have found beyond a reasonable doubt that defendant did not act in self-defense where his use of deadly force against Evans was not objectively reasonable.

¶ 37    Finally, defendant asserts an alternative argument on appeal, namely, that if we do not reverse his conviction outright, we should nonetheless correct his mittimus to reflect only one count of felony murder, pursuant to the one-act, one-crime doctrine. The State, for its part, concedes this point.

¶ 38    Briefly, multiple convictions are improper if they are based on precisely the same physical act and our courts have made clear that a defendant may not be convicted of multiple offenses based on the same act. See *People v. Johnson*, 237 Ill. 2d 81, 97 (2010);

*People v. Crespo*, 203 Ill. 2d 335, 342-43 (2010); accord *People v. Burney*, 2011 IL App (4th) 100343, ¶ 86 (where a single act is involved, multiple convictions are improper); see also *People v. Miller*, 238 Ill. 2d 161, 165 (2010). Most significantly with respect to the instant cause, when a murder is involved, "[w]here but one person has been murdered, then there can be but one conviction of murder." *People v. Cardona*, 158 Ill. 2d 403, 411 (1994).

¶ 39    The trial court here found defendant guilty of felony murder in relation to the death of Thompson. It is undisputed that only one death occurred. However, defendant's mittimus lists three felony murder convictions. By all accounts, this is improper. Accordingly, we correct defendant's mittimus to reflect one conviction for felony murder with a sentence of 20 years in prison, and we do not disturb his conviction and sentence for aggravated discharge of a firearm.

¶ 40                                CONCLUSION

¶ 41    For all the foregoing reasons, we affirm the judgment of the trial court, with a correction to the mittimus as directed herein.

¶ 42    Affirmed, mittimus corrected.